Charles M. GROSSMAN, M.D.,
Plaintiff–Appellant,

v.

CITY OF PORTLAND, a public body,
and Todd Davis, Defendants–
Appellees.

No. 92–35492.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Nov. 3, 1993.

Decided Sept. 6, 1994.

Karl G. Anuta, Jolles, Sokol & Bernstein, Portland, OR, for plaintiff-appellant.

Harry Auerbach, Deputy City Atty., Portland, OR, for defendants-appellees.

Before: REINHARDT, BRUNETTI, and FERNANDEZ, Circuit Judges.

REINHARDT, Circuit Judge:

This appeal presents us with the question of the constitutionality of an ordinance requiring all speakers, demonstrators, and entertainers to obtain a permit before making use of the public parks.

Under former section 20.08.010 of the Portland City Code, it was unlawful for any person "to conduct or participate in any organized entertainment, demonstration, or public gathering, or to make any address, in a park" without a written permit issued by the Parks Commissioner. Unaware of this ordinance, and lacking the required permit,

members of the local chapter of Physicians for Social Responsibility staged a small, peaceful anti-nuclear protest, involving six to eight people, in Portland's Waterfront Park. Dr. Charles Grossman carried a sign in the protest and was arrested and handcuffed by Portland police officers. He subsequently sued the City of Portland ("the City") and the primary arresting officer under 42 U.S.C. § 1983, claiming that the arrest violated his First Amendment right to free speech. We agree, and reverse in part the district court's grant of summary judgment to defendants.

## I.

During the Portland Rose Festival in June of 1990, the USS New Jersey, a navy ship equipped with nuclear weapons, was stationed in Portland Harbor adjacent to Waterfront Park. Members of the local chapter of Physicians for Social Responsibility decided to demonstrate in Waterfront Park in opposition to the presence of nuclear weapons in the harbor. A small group planned the protest a few days in advance, but did not attempt to obtain a permit for use of the park since they did not believe that one was required. Dr. Grossman, a doctor and a member of Physicians for Social Responsibility, participated in the protest.

As Dr. Grossman describes the relevant events:

I was standing silently with several other doctors and a few others with a sign in my hand saying "Rose Festival is a fun time, we don't need nuclear weapons." About 2:30 P.M., 3 or 4 policemen approached and asked us to leave. I asked why and was told that we have no right to stand in a city park carrying a sign. I then asked what ordinance said we had no such right. I was told by one officer we were violating an ordinance, and I do not recall if he

quoted a number. I put my sign down and said "O.K. I am not carrying a sign." His response was that if I did not leave within 30 seconds I would be forcibly removed. I said we were creating no disturbance and again asked why such a confrontation was necessary. I took out my pen and paper and asked him for his name and number. While I was writing my two arms were forcibly seized, forced behind my back and handcuffs were applied. I was walked out of the park area, about 30 feet, to a Police car.

At the time Dr. Grossman was arrested, the Portland Rose Festival Association held an exclusive permit for use of Waterfront Park. Officer Todd Davis, the primary arresting officer, knew of the grant of exclusive rights to the Rose Festival adherents, and was aware that the members of Physicians for Social Responsibility were demonstrating without having obtained the City's permission in advance. His characterization of the events differs from Dr. Grossman's principally in that he asserts that prior to the arrest Dr. Grossman "became argumentative" with him and refused to leave the park voluntarily.

The arresting officers drove Dr. Grossman to the police command post, and cited him for violating PCC 20.12.030 and 20.12.240. PCC 20.12.030, now amended, prohibited persons from attaching signs or other objects to park property.[1] PCC 20.12.240 prohibits persons from refusing to obey a reasonable directive of a police officer.[2] As the penalty for his conduct, Dr. Grossman was issued an exclusion order prohibiting him from returning to Waterfront Park for thirty days.

Dr. Grossman appealed the exclusion order. The City's Code Hearing Officer, pursuant to a stipulation by the City Attorney's

---

1. The ordinance was poorly drafted, although its caption—"Advertising and Decorative Devices"—should have signaled that it was inapplicable to Dr. Grossman's conduct. It provided, in relevant part, that: "[i]t is unlawful for any person to place or carry any sign ... of any kind whatever ... on any of the vases, statues, bridges, or monuments in any park." PCC 20.-12.030 (amended 1990). In its revised form, the ordinance is still inapplicable to Dr. Grossman's conduct, but its language is much clearer. It

now provides, in part, that "[o]n any tree ... or other structure in any park, it is unlawful for any person to place any ... sign ... of any kind." and it specifically declares that "nothing in this Section shall prohibit the carrying of signs in the parks." PCC 20.12.030(a) & (c).

2. Before this court, the City does not rely on PCC 20.12.240 in seeking to uphold Dr. Grossman's arrest.

Office, concluded that PCC 20.12.030 did not prohibit Dr. Grossman from carrying a sign in the park.[3] Accordingly, the order was pronounced void.

Dr. Grossman subsequently filed this § 1983 action in state court against the City and Officer Davis. Claiming that his arrest in Waterfront Park violated his rights of free speech and assembly under the First Amendment, he requested damages for injuries allegedly suffered during the arrest, as well as punitive damages.[4] The defendants removed the case to federal district court. There they argued that Dr. Grossman's arrest was valid under former PCC 20.08.010 ("section 010"), which bars persons from, among other things, participating in an "organized ... demonstration" in a public park without a permit.[5] After several months during which discovery was conducted, the district court granted the defendants' motion for summary judgment in May 1992.[6]

In explaining its judgment, the court adopted a somewhat unusual approach to the legal issues. It did not reach the question whether section 010 was unconstitutional, but instead rested its holding solely on the fact that under that section the arresting officers had probable cause to make the arrest. It then reasoned that because probable cause to arrest existed, the officers' actions were "privileged" and both the City and Officer Davis were protected from liability.

Dr. Grossman timely appeals to this court.

## II.

■ The district court relied upon *City of Los Angeles v. Heller*, 475 U.S. 796, 106 S.Ct. 1571, 89 L.Ed.2d 806 (1986), in holding that because the arresting officers had probable cause to arrest Dr. Grossman under section 010,[7] the arrest was "privileged" and both Davis and the City were protected from liability. This is a clear misreading of *Heller*.

*Heller* holds that when a person sues under § 1983 for an allegedly unconstitutional arrest the city cannot be held liable absent a constitutional violation by the arresting officer. The specific constitutional violations alleged in *Heller* were that the arrest was made without probable cause and with unreasonable force. *Heller*, 475 U.S. at 797, 106 S.Ct. at 1572. Therefore, the jury's finding of probable cause and reasonable force obviated the plaintiff's constitutional claim, because it meant that the plaintiff had suffered no constitutional injury.

Here, in contrast, Dr. Grossman's constitutional claim does not stem from an absence of probable cause to arrest, but from the alleged unconstitutionality of the ordinance justifying the arrest. Therefore, a finding of probable cause under the ordinance in no way renders the arrest "privileged," or immunizes the defendants from liability. Instead, if the ordinance is unconstitutional, Dr.

3. Three weeks later, PCC 20.12.030 was amended and its language clarified; now its scope even more clearly coincides with the City Attorney's interpretation of it. *See* discussion *supra* note 1.

4. Although Dr. Grossman states in his complaint that Officer Davis "assaulted" him, he does not assert an independent excessive force claim. Instead, his claimed right to compensation is based entirely on the fact that the damages he suffered were a "direct and proximate result" of the First Amendment violation.

5. Section 010 also has been amended since the time of the Grossman affair. It now prohibits persons from participating in "any organized event" in the park without a permit. *See* PCC 20.08.010. So it goes. *See* Vonnegut, Slaughterhouse–Five *passim* (1966).

6. In granting summary judgment, the district court summarily adopted a magistrate's findings

and recommendation. All further discussion of the district court's judgment, therefore, will be based on the magistrate's more extended analysis.

7. There is no doubt that under the provisions of section 010 the arresting officers had probable cause to arrest Dr. Grossman. Dr. Grossman agrees that he and the other members of Physicians for Social Responsibility were conducting an "organized demonstration" in Waterfront Park without a permit, and uncontroverted evidence shows that the arresting officers were aware of their lack of a permit. In these circumstances, it is clear that under the terms of the ordinance "at the moment of arrest, the facts and circumstances known to the arresting officers [were] 'sufficient to warrant a prudent man in believing that the [arrestee] had committed or was committing an offense.'" *United States v. Lindsey*, 877 F.2d 777, 783 (9th Cir.1989) (quoting *Beck v. Ohio*, 379 U.S. 89, 91, 85 S.Ct. 223, 225, 13 L.Ed.2d 142 (1964)).

Grossman suffered constitutional injury despite the ordinance's applicability to his conduct. *See Gerritsen v. City of Los Angeles,* 994 F.2d 570 (9th Cir.) (upholding § 1983 damages action because of enforcement of unconstitutional permit requirement for handbill distribution in public park), *cert. denied,* —— U.S. ——, 114 S.Ct. 306, 126 L.Ed.2d 253 (1993).

The key issue in the present case, as in *Gerritsen,* is whether the city ordinance is unconstitutional. The district court was fundamentally mistaken in not considering this issue. In fact, the only way that the district court could have correctly avoided deciding the constitutionality of section 010 would have been to find that the ordinance did *not* cover Dr. Grossman's conduct or that Davis was *not* acting pursuant to its authority in making the arrest. The district court's finding of probable cause under section 010, rather than *precluding* an investigation into the ordinance's constitutionality, as the court ruled, had precisely the opposite effect: it *required* that the court evaluate the ordinance's constitutionality.

### III.

It is indisputable that Dr. Grossman and the other members of Physicians for Social Responsibility were exercising their First Amendment rights by demonstrating against the presence of nuclear weapons in Portland harbor. The City argues, however, that the right to demonstrate in Waterfront Park is subject to limitation by virtue of its authority to protect "the safety and convenience" of park users, and that section 010 constituted a constitutional exercise of that authority.

Section 010 provided that:

It is unlawful for any person to conduct or participate in any organized entertainment, demonstration, or public gathering, or to make any address, in a park without the written permission of the [Parks Commissioner].

To obtain a permit, a person was required to file a written application with the Parks Commissioner describing the details of the planned event, and the Commission then had seven days within which either to grant or deny the permit. PCC 20.08.020. Thus, irrespective of the Commissioner's decision on the merits of the permit application, persons wanting to engage in the activities enumerated in the ordinance faced the burden of applying for a permit with the Commissioner and of waiting for up to seven days for his response. The ordinance thus required potential speakers, demonstrators and entertainers to plan their activities well in advance, precluding such persons from using the parks for more spontaneous First Amendment activity.

### A.

■ At the outset, we emphasize that as a "prior restraint" on the exercise of First Amendment rights, section 010 comes to this court "bearing a heavy presumption against its constitutional validity." *Vance v. Universal Amusement Co., Inc.* 445 U.S. 308, 317, 100 S.Ct. 1156, 1162, 63 L.Ed.2d 413 (1980) (quotations omitted); *see also Rosen v. Port of Portland,* 641 F.2d 1243, 1247–50 (9th Cir.1981) (one day advance notice requirement for demonstrating or leafletting in airport terminal constitutes invalid prior restraint); *Community For Creative Non–Violence v. Turner,* 893 F.2d 1387, 1389–90 (D.C.Cir.1990) (permit requirement for persons wanting to engage in free speech activities in Washington subway constitutes invalid prior restraint). This heavy presumption is justified by the fact that "prior restraints on speech . . . are the most serious and the least tolerable infringement on First Amendment rights." *Nebraska Press Ass'n v. Stuart,* 427 U.S. 539, 559, 96 S.Ct. 2791, 2803, 49 L.Ed.2d 683 (1975).

■ Another significant consideration is that section 010 restricted access to the public parks, the "quintessential public forums." *Perry Education Ass'n v. Perry Local Educators' Ass'n,* 460 U.S. 37, 45, 103 S.Ct. 948, 955, 74 L.Ed.2d 794 (1983); *Gerritsen,* 994 F.2d at 576. As we emphasized in *NAACP v. City of Richmond,* 743 F.2d 1346, 1355 (9th Cir.1984), "[p]ublic fora have achieved a special status in our law; the government must bear an extraordinarily heavy burden to regulate speech in such locales." Parks, in particular, "have immemorially been held

in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." *Hague v. CIO*, 307 U.S. 496, 515, 59 S.Ct. 954, 964, 83 L.Ed. 1423 (1939). This venerable tradition of the park as public forum has—as suggested by the attendant image of the speaker on a soapbox—a very practical side to it as well: parks provide a free forum for those who cannot afford newspaper advertisements, television infomercials, or billboards. *Cf. City of Ladue v. Gilleo*, — U.S. —, —, 114 S.Ct. 2038, 2046, 129 L.Ed.2d 36 (1994) (financial considerations "may make the difference between participating and not participating in some public debate"); *City of Richmond*, 743 F.2d at 1356 (warning that "we must examine restrictions on speech with particular care when their effects fall unevenly on different ... groups in society," and reminding that "[t]here is no equality in a law prohibiting both rich and poor from sleeping under the bridges of Paris").[8]

### B.

▮ Nonetheless, as the City suggests, certain restrictions on speech in the public parks are valid. Specifically, a municipality may issue reasonable regulations governing the time, place or manner of speech. *See, e.g., Ward v. Rock Against Racism*, 491 U.S. 781, 802–03, 109 S.Ct. 2746, 2760, 105 L.Ed.2d 661 (1989). To be upheld as a constitutional time, place or manner restriction,[9] a permit requirement applying to First Amendment activity in a public park must "(1) be content-neutral, (2) be narrowly tailored to serve a significant government interest, and (3) leave open ample alternative channels of expression." *Gerritsen*, 994 F.2d at 577; *Ward*, 491 U.S. at 789–90, 109 S.Ct. at 2753. The failure to satisfy any single prong of this test invalidates the requirement. *Turner*, 893 F.2d at 1392. PCC 20.-08.010 failed at least the "narrowly tailored" prong.[10]

▮ The requirement of narrow tailoring means that a time, place or manner restriction on First Amendment activity may not "burden substantially more speech than is necessary to further the government's legitimate interests." *Ward*, 491 U.S. at 799, 109 S.Ct. at 2758. The City asserts that the challenged ordinance focused on specific types of expressive conduct that most threat-

---

**8.** While our tradition of the parks as a forum for public debate may have always rested in part on economic concerns, this factor is increasingly significant now, when the extremely rich have an enormous variety of privately-owned media through which to reach the public, and political careers can be launched by the mere fact that the putative candidate has a fortune to spend on advertising. At present, more democratic means of communication—demonstrations in parks, bumper stickers, signs in the windows of homes—must be jealously protected. *Cf. Ladue*, — U.S. at —, 114 S.Ct. at 2047 (striking down ordinance that barred respondent from placing political sign in the window of her home).

**9.** We note that the permit requirement imposed by section 010, similar to the advance notice requirement at issue in *Rosen*, actually "lies somewhere between the classic prior restraint cases in which speech is totally prohibited, and the classic 'time, place, and manner' cases in which the time, location, or volume of speech are regulated." *Rosen*, 641 F.2d at 1249–50 (citations omitted). It is, more precisely, "a 'prior restraint' intended to permit efficient 'time, place and manner' regulation." *Id.* at 1250.

Under one well-known line of cases involving challenges to permit requirements, the reviewing court looks behind the requirement itself to the criteria, or lack of criteria, guiding city officials in determining whether to issue a permit. *See, e.g., Shuttlesworth v. City of Birmingham*, 394 U.S. 147, 89 S.Ct. 935, 22 L.Ed.2d 162 (1969); *Kunz v. New York*, 340 U.S. 290, 71 S.Ct. 312, 95 L.Ed. 280 (1951). The present case, however, like *Turner*, involves a different type of challenge. Rather than attacking the constitutionality of the permitting criteria, or asserting that city officials have been given unbridled discretion to grant or deny permits, Dr. Grossman challenges the permit requirement itself as burdening substantially more speech than necessary.

**10.** Because both parties agree that the ordinance is content neutral, we do not examine that prong. As to the "significant government interest" requirement contained in the second prong, the City's stated interest in protecting the safety and convenience of park users may be sufficient. *See Ward*, 491 U.S. at 797, 109 S.Ct. at 2757 ("[t]he city enjoys a substantial interest in ensuring the ability of its citizens to enjoy whatever benefits city parks have to offer"). Again, however, we need not decide the question and we simply assume ad arguendo that such is the appropriate interest to be considered here. Finally, since we invalidate the ordinance for its lack of narrow tailoring, we also need not decide whether it leaves open ample alternative channels of expression.

en the City's interest in protecting the safety and convenience of park users.[11]

Although we sympathize with the City's concern for the safety and convenience of park users, we cannot agree that this concern could justify the broad sweep of section 010 and the substantial restrictions it imposed. As we emphasized in *Rosen*, and reiterated in *City of Richmond*, advance notice provisions such as that subsumed within section 010's permit requirement "drastically burden free speech." *Rosen*, 641 F.2d at 1249; *City of Richmond*, 743 F.2d at 1355–56. Both the procedural hurdle of filling out and submitting a written application, and the temporal hurdle of waiting for the permit to be granted may discourage potential speakers. Moreover, because of the delay caused by complying with the permitting procedures, "[i]mmediate speech can no longer respond to immediate issues." *Id.* at 1355. Spontaneous expression, which is often the most effective kind of expression, is prohibited by the ordinance. *Id.; see also Shuttlesworth*, 394 U.S. at 163, 89 S.Ct. at 945 ("timing is of the essence in politics.... when an event occurs, it is often necessary to have one's voice heard promptly, if it is to be considered at all"); *Community for Creative Non–Violence v. Turner*, 714 F.Supp. 29, 33 (D.D.C.1989) (noting that the " 'built-in delay mechanism' " inherent in the challenged permit requirement "serves to deter and may even preclude expression necessary to provide an immediate response to late-breaking events"), *amended*, 729 F.Supp. 869, *aff'd in part, rev'd in part on other grounds*, 893 F.2d 1387 (D.C.Cir.1990).

Some type of permit requirement *may* be justified in the case of large groups, where the burden placed on park facilities and the possibility of interference with other park users is more substantial. *See Rosen*, 641 F.2d at 1248 n. 8 (stating that even if 24–hour advance notice requirement were justified for large groups, it sweeps too broadly in regulating small groups). However, though the City declares (somewhat unconvincingly) that the actions of single protestors were excluded from section 010's sweep, it does not proffer a reading of the ordinance that

would, for example, have limited it to groups larger than Dr. Grossman's; nor is any such limitation evident from the ordinance's language.

In fact, the language of section 010 was extremely broad. It prevented persons from "mak[ing] any address" or participating in any organized entertainment, demonstration, or public gathering in the park without a permit. While the City places great emphasis on the ordinance's use of the term "organized," we find its reliance on that term unpersuasive. Like the District of Columbia Circuit in *Turner*, which invalidated a Washington Metropolitan Area Transit Authority (WMATA) regulation requiring a permit for engaging in "free speech activities" in the Washington, D.C. subway—specifically, "the organized exercise of rights and privileges which deal with political, religious, or social matters and are non-commercial" (893 F.2d at 1389 (quoting the regulation))—we believe that the "meaning of 'organized' is at best vague." *Turner*, 893 F.2d at 1392. As that court observed, "[i]t is unclear why an individual's decision to wear a political button or a tee-shirt bearing a slogan would not be an 'organized' free speech activity requiring a permit."

Although—in contrast to the general prohibition on organized free speech activities at issue in *Turner*—section 010 enumerated a specific list of prohibited activities, its scope was similarly broad. Like the WMATA regulation, section 010 might have prohibited Dr. Grossman and his companions from standing silently wearing T-shirts critical of nuclear weapons, as well as from carrying signs. Or, it might have applied if he had been "making an address" about nuclear weapons to his companions, or even if he were merely standing silently by in his capacity as a member of an "organized" audience while someone else spoke. In practical effect, therefore, section 010 suffered from the same defect as the WMATA regulation: it burdened at least as broad a range of protected speech.

In addition, the City's stated interests and the burden that the park ordinance imposed

---

**11.** Similarly, quoting PCC 20.08.020(c), the City states that section 010 "is directed toward specific forms of conduct that 'create a substantial burden in maintaining and policing the park facility or maintaining normal quiet in the area adjacent to or near the park.' "

on speech do not sufficiently match. Consider this: if Dr. Grossman and his companions had been standing in a group in the park after meeting unexpectedly, and had been discussing gardening, or the Portland Trailblazers, the doctor would not have been arrested. While the addition of signs—or T-shirts, or an "address"—would have occasioned the application of section 010, the distinctions are absolutely empty in terms of the ordinance's stated goals. A group of 100 family members and friends could have had a noisy picnic in the park secure in the knowledge that they would be unimpeded by law enforcement officers, while Dr. Grossman's small group silently carrying signs or wearing T-shirts would have been classified as law-breakers and subject to forcible removal by armed police. It is when persons gathered in order to speak that the ordinance was most readily triggered. In short, the ordinance did not simply burden speech; it discriminated against speech.[12] Rather than being narrowly tailored to protect speech, as it should have been, it was tailored so as to preclude speech.

In this respect, section 010 suffered by comparison with the permit provision covering use of the City's public streets. In contrast with the per se rule described in section 010, the street ordinance imposes a permit requirement only "when City services are required because the event interferes with normal vehicular or pedestrian traffic."

PCC 16.60.020(A). Because it links the permit requirement to its practical justification—thus excluding conduct that poses no risk to the City's interests—and because it does not single out speech-related activities for coverage, the street ordinance is much more narrowly tailored. Other cities have park ordinances that contain similar language.[13] Given that such limiting provisions are possible, we see no justification for the overly broad sweep of section 010. *See City of Richmond,* 743 F.2d at 1356–57 (striking down advance notice requirement in parade ordinance after comparing it unfavorably to other cities' ordinances).

Finally, section 010's lack of narrow tailoring is particularly conspicuous in the present case. Although the City contends that Dr. Grossman, by demonstrating without a permit at the same time that another organization was conducting a permitted event, "was participating in exactly the type of problematic conduct that [section 010 was] ... designed to address," we simply cannot agree that six to eight people carrying signs in a public park constituted enough of a threat to the safety and convenience of park users— even the adherents of the Rose Festival—to justify the restrictions imposed on their speech here.

▪ Because section 010 "restrict[ed] a substantial quantity of speech that [did] not impede [the City's] permissible goals," it is

---

**12.** *Cf. A Quaker Action Group v. Morton,* 516 F.2d 717, 728 (D.C.Cir.1975) (upholding permit requirement for "public gatherings" on the White House sidewalk on the assumption that the Park Service would "issue an implementing regulation defining 'public gathering' in terms that do not impermissibly discriminate against First Amendment activity, e.g., whether a person has a sign"). It should be emphasized that the government interest at stake in *Morton* was "the protection of the President," which surely provides a public interest of the highest order. *See id.* at 726.

Moreover, each of the ordinance's enumerated activities clearly involve speech. As the Supreme Court recognized in *Morton,* a "public gathering," is an occasion for speech; a "demonstration" or an "address" is, by definition, speech; and so is "entertainment," despite its more frivolous connotations. *See Ward,* 491 U.S. at 789–90, 109 S.Ct. at 2753.

**13.** Since only the Portland park ordinance is before us in this case, we express no view as to the constitutional validity of any other city's ordi-

nance; we do note, however, that many other cities have park ordinances that appear much more narrowly tailored than section 010. *See, e.g.,* Fullerton, Ca., Municipal Code § 9.12.440 (park permit required if "the event is of a type which is or has been attended throughout the United States by gatherings of more than one hundred fifty teenage or older people"); Palm Springs, Ca., Ordinances § 11.44.040 (park permit required for event of "fifty or more persons"); San Francisco Park Code § 7.03(b) (park permit required for certain events involving 50 or more persons at the same time within an area circumscribed by a 500-foot radius); *cf.* Burbank Municipal Code § 29–1702 (no parade permit required for "any event which the Chief of Police determines is unlikely to constitute a substantial or unreasonable hazard or impediment to the normal flow of traffic"); *see also Turner,* 714 F.Supp. at 33 (stating that the problem with the challenged permit requirement was that, among other things, it made no distinction based on "the size of the prospective gathering, [or] the possibility of disruption").

unconstitutional. *See Turner,* 893 F.2d at 1392 (WMATA permit regulation not narrowly tailored as it restricts many activities that would not interfere meaningfully with WMATA's asserted interests). The ordinance thus could not lawfully bar Dr. Grossman from protesting in the park. Since Dr. Grossman was unlawfully arrested pursuant to an unconstitutional city ordinance while exercising his First Amendment rights, he is entitled to recover damages from the City. *Gerritsen,* 994 F.2d at 580.

### IV.

Although we conclude that the district court erred in granting summary judgment for the defendants on the ground that Dr. Grossman suffered no constitutional injury, we must also consider whether the district court's judgment can be upheld on any other ground urged by any of the parties. *See Jackson v. Southern California Gas Co.,* 881 F.2d 638, 643 (9th Cir.1989). The City does not assert any alternative ground on which the judgment in its favor may be upheld. However, Officer Davis does: qualified immunity. Therefore, we must consider whether the judgment in Officer Davis's favor may be upheld on that ground. We conclude that there is no genuine issue of material fact on this question, and that Davis is entitled to qualified immunity as a matter of law. Accordingly, we affirm the judgment in his favor.

■ The doctrine of qualified immunity shields public officials performing discretionary functions from personal liability under certain circumstances. *See Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). As the Supreme Court explained in *Anderson v. Creighton,* 483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987), "whether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective legal reasonableness' of the action, assessed in light of the legal rules that were 'clearly established' at the time it was taken." *Id.* at 639, 107 S.Ct. at 3038 (citations omitted) (quoting *Harlow,* 457 U.S. at 818, 819, 102 S.Ct. at 2738, 2738–39). An official's claim of qualified immunity will be defeated if, "in the light of pre-existing law" the unlawfulness of his conduct was "apparent." *Id.* 483 U.S. at 640, 107 S.Ct. at 3039.

Although the standard set forth in *Harlow* and *Anderson* always represents our ultimate inquiry in every qualified immunity case, it is of course neither a mechanical nor an inflexible test. As with many general legal standards, its application varies depending on the type of case we are addressing. In classes of cases in which we have considered it helpful to do so, we have divided the *Harlow/Anderson* inquiry into various two-part [14] or three-part [15] tests. In other types of cases, we have straightforwardly conducted the *Harlow/Anderson* inquiry, without any need for mediating doctrines or additional multi-pronged tests.[16]

■ We believe that the various two- and three-part tests which we have occasionally employed in qualified immunity cases would not be of any particular value in applying the *Harlow/Anderson* test here. Moreover, we note that in our immunity determination in this case we must be sensitive to certain considerations which are not present

14. *See, e.g., Palmer v. Sanderson,* 9 F.3d 1433, 1435 (9th Cir.1993); *Hallstrom v. City of Garden City,* 991 F.2d 1473, 1482 (9th Cir.), *cert. denied,* — U.S. —, 126 S.Ct. 549, 126 L.Ed.2d 450 (1993); *Act Up!/Portland v. Bagley,* 988 F.2d 868, 871 (9th Cir.1993); *Hemphill v. Kincheloe,* 987 F.2d 589, 592 (9th Cir.1993).

15. *See, e.g., Hamilton v. Endell,* 981 F.2d 1062, 1066 (9th Cir.1992); *Erickson v. United States,* 976 F.2d 1299, 1301 (9th Cir.1992); *DeNieva v. Reyes,* 966 F.2d 480, 484–85 (9th Cir.1992); *Romero v. Kitsap County,* 931 F.2d 624, 627 (9th Cir.1991).

16. *See, e.g., Figueroa v. United States,* 7 F.3d 1405, 1408–13 (9th Cir.1993), *cert. denied,* —

U.S. —, 114 S.Ct. 1537, 128 L.Ed.2d 190 (1994); *Price v. Akaka,* 3 F.3d 1220, 1225–26 (9th Cir.1993), *cert. denied,* — U.S. —, 114 S.Ct. 1645, 128 L.Ed.2d 365 (1994); *Camarillo v. McCarthy,* 998 F.2d 638, 639–40 (9th Cir.1993); *Morgan v. Woessner,* 997 F.2d 1244, 1259–60 (9th Cir.1993), *cert. dism'd,* — U.S. —, 114 S.Ct. 671, 126 L.Ed.2d 640 (1994); *Wood v. Ostrander,* 879 F.2d 583, 591 (9th Cir.1989), *cert. denied,* 498 U.S. 938 (1990); *see also Elder v. Holloway,* 984 F.2d 991, 994–95 (9th Cir.1993) (Kozinski, J., dissenting from the denial of en banc) (setting forth the general rules governing the qualified immunity defense but, quite sensibly, never mentioning any two-part, three-part, seven-part, or fifteen-part test).

in all qualified immunity cases. Unlike in many such cases, here the allegedly unconstitutional action undertaken by the individual defendant consists solely of the enforcement of an ordinance which was duly enacted by the city council. As Chief Justice Warren explained in *Pierson v. Ray*, 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967), police officers' claims of qualified immunity in such a context raise special dilemmas:

> A policeman's lot is not so unhappy that he must choose between being charged with dereliction of duty if he does not arrest when he has probable cause, and being mulcted in damages if he does. Although the matter is not entirely free from doubt, the same consideration would seem to require excusing him from liability for acting under a statute that he reasonably believed to be valid but that was later held unconstitutional, on its face or as applied.

*Id.* at 555, 87 S.Ct. at 1218. Even though the Supreme Court subsequently replaced the subjective "good-faith" qualified immunity standard applied in *Pierson* with an objective "reasonableness" inquiry,[17] courts have continued to adhere to the central principle enunciated in that case: where a police officer has probable cause to arrest someone under a statute that a reasonable officer could believe is constitutional, the officer will be immune from liability even if the statute is later held to be unconstitutional.[18]

**17.** *See Harlow*, 457 U.S. at 815–19, 102 S.Ct. at 2736–39.

**18.** In addition to the concerns expressed by Chief Justice Warren in *Pierson*, there is an additional reason why local law enforcement officers enforcing a duly promulgated city ordinance should ordinarily be entitled to immunity. As the Court explained in *Harlow*, the various doctrines of official immunity are the result of a balancing of two important interests: the interest in the "vindication of constitutional guarantees," and the interest in avoiding the social costs that inhere in imposing personal liability on public officials. *See Harlow*, 457 U.S. at 813–15, 102 S.Ct. at 2735–37. Where, as here, a local police officer enforces an unconstitutional ordinance, relief lies against the city, *see Monell v. Department of Social Serv.*, 436 U.S. 658, 694, 98 S.Ct. 2018, 2037–38, 56 L.Ed.2d 611 (1978), so the interest in the vindication of constitutional guarantees is fully satisfied without holding the officer individually liable.

**19.** We do not deal here with an ordinance which has fallen into desuetude. An officer enforcing

Moreover, when a city council has duly enacted an ordinance, police officers on the street are ordinarily entitled to rely on the assumption that the council members have considered the views of legal counsel and concluded that the ordinance is a valid and constitutional exercise of authority. Courts have accordingly held that the existence of a statute or ordinance authorizing particular conduct is a factor which militates in favor of the conclusion that a reasonable official would find that conduct constitutional.[19] *See, e.g., Evers v. County of Custer*, 745 F.2d 1196, 1203 (9th Cir.1984); *Malachowski v. City of Keene*, 787 F.2d 704, 713–14 (1st Cir.), *cert. denied*, 479 U.S. 828, 107 S.Ct. 107, 93 L.Ed.2d 56 (1986).

As with most legal matters, there are no absolutes here. On the one hand, an officer who acts in reliance on a duly-enacted statute or ordinance is ordinarily entitled to qualified immunity.[20] On the other, as historical events such as the Holocaust and the My Lai massacre demonstrate, individuals cannot always be held immune for the results of their official conduct simply because they were enforcing policies or orders promulgated by those with superior authority. Where a statute authorizes official conduct which is patently violative of fundamental constitutional principles, an officer who enforces that statute is not entitled to qualified immunity.

such an enactment is not necessarily entitled to rely on the assumption that it continues to be consistent with the current state of constitutional law. *See generally* Calabresi, A Common Law for the Age of Statutes 1–15 (1982) (discussing "the problem of legal obsolescence"). Similarly, an officer who enforces a statute in an arbitrary or discriminatory manner is not entitled to presume that his conduct is constitutional simply because the statute exists.

**20.** *Cf. Chew v. Gates*, 27 F.3d 1432 (9th Cir.1994) (holding, in part, that officers implementing a long-established policy are entitled to qualified immunity where no then-existing case law demonstrated that the particular policy was unconstitutional and the only appellate case on point had upheld a similar policy); *Dodd v. City of Norwich*, 827 F.2d 1, 4 (2d Cir.1987) (instructing the district court to consider whether the individual defendant "is entitled to a qualified good faith immunity based on his following the policy and training of the police department"), *cert. denied*, 484 U.S. 1007, 108 S.Ct. 701, 98 L.Ed.2d 653 (1988); *Sullivan v. Town of Salem*, 805 F.2d 81,

**1210**

Similarly, an officer who unlawfully enforces an ordinance in a particularly egregious manner, or in a manner which a reasonable officer would recognize exceeds the bounds of the ordinance, will not be entitled to immunity even if there is no clear case law declaring the ordinance or the officer's particular conduct unconstitutional. *See Chew*, 27 at 1449–50. In the end, however, an officer who reasonably relies on the legislature's determination that a statute is constitutional should be shielded from personal liability.

Applying these principles, we conclude that Davis's actions in arresting Dr. Grossman pursuant to section 010 were "objective[ly] legal[ly] reasonable[ ]." *Harlow*, 457 U.S. at 819, 102 S.Ct. at 2739. The exclusion order Davis presented to Dr. Grossman after his arrest cited only PCC 20.12.030 and PCC 20.12.240. However, the record makes clear that Davis made the decision to arrest the doctor largely because he and his colleagues did not have a permit to demonstrate in the park, and Davis correctly believed that a city ordinance required one. Dr. Grossman's conduct was in fact proscribed by section 010. Thus, there is no doubt from the record that Davis had probable cause to arrest him under that section. Dr. Grossman and his group unquestionably violated the terms of the ordinance: They were conducting an "organized ... demonstration ... in a park without the written permission of the Commissioner In Charge of the Bureau of Parks or the Council." *Former* PCC 20.08.010. Finally, it was objectively reasonable for Davis to rely on the constitutionality of the ordinance requiring permits for the use of the park, section 010. This ordinance, which had been duly promulgated by the city council, was not so obviously unconstitutional as to require a reasonable officer to refuse to enforce it. City councils have authority, consistent with the First Amendment, to adopt certain time, place, and manner restrictions

regulating the use of public parks by groups, including in some circumstances narrowly-tailored permit requirements. Thus, Davis was reasonably entitled to rely on the city council's judgment that it was lawful to require a group desiring to use the park to obtain a permit.

Accordingly, we conclude that Davis is entitled to qualified immunity and affirm the judgment in his favor only.

### V.

We therefore affirm in part and reverse in part the district court's judgment, and remand for further proceedings consistent with this opinion.

REVERSED and REMANDED.

---

87 (2d Cir.1986) ("[I]f those officers, including the building official, were simply implementing an established policy of the town, then they would have available to them a defense of qualified immunity from personal liability, provided

they can establish objective good faith in relying on the town's policy.").