*458 MICHAEL, Circuit Judge,
dissenting.
The majority, relying on Richardson v. City of South Euclid, 904 F.2d 1050 (6th Cir.1990), concludes that Reyes’s claim for nominal damages must fail because he suffered no constitutional injury from being indicted and prosecuted under the Lynch-burg public assembly ordinance. I respectfully disagree. Reyes, unlike the plaintiffs in Richardson, has alleged a classic First Amendment injury by claiming that his indictment and prosecution under the ordinance chilled the exercise of his constitutional rights of free speech and assembly. Because the City has done nothing to cast doubt on the truth of this allegation, the district court erred when it determined on summary judgment that Reyes had not suffered any constitutional injury.
A.
As the majority explains, the plaintiffs in Richardson sought damages under 42 U.S.C. § 1983 to compensate them for their alleged humiliation, emotional distress, physical harm, loss of earnings, and legal expenses that resulted from defending against prosecution under an ordinance later found to be unconstitutional. The plaintiffs in Richardson did not allege that their speech or conduct had been chilled or deterred as a result of the prosecution, a fact critical to the analysis in that case. Rather, as the Sixth Circuit put it, the question was whether a constitutional injury was present “where no deprivation other than that suffered as a result of maintaining a legal defense is sustained by the party prosecuted.” Id. at 1051. Because the injury alleged in Richardson was solely that of defending against a prosecution — an injury of being required to engage in the criminal process — the court analyzed the claim under the Due Process Clause rather than the First Amendment. Id. at 1052-53. In its due process analysis, the court reasoned that “[t]he prosecution itself is the observance of process due the accused.” Id. at 1053. More particularly, the plaintiffs in Richardson had received due process because they “were charged in writing, permitted an opportunity to respond in open court, and vindicated by the dismissal of all charges after the municipal court found the ordinance unconstitutional.” Id.
This case is quite different. Unlike the plaintiffs in Richardson, Reyes alleges that because of his indictment and prosecution, “[t]he fear of criminal prosecution has caused [him] to be deterred and chilled in the exercise of [his] fundamental constitutional rights,” including the First Amendment rights of free speech and peaceable assembly.[1] Thus, Reyes alleges that his speech was chilled during the period in which he was indicted and prosecuted under the ordinance prior to its repeal. The act of defending against a criminal prosecution under an unconstitutional ordinance may or may not constitute a First *459 Amendment injury.[2] But being inhibited from speaking because of an ongoing prosecution is a classic First Amendment injury. See Vernon Beigay, Inc. v. Traxler, 790 F.2d 1088, 1091 (4th Cir.1986) (assuming that police officers’ actions had actually chilled plaintiffs speech, then plaintiff suffered a First Amendment injury in fact); Pittman v. Cole, 267 F.3d 1269, 1283 (11th Cir.2001) (allegation that Alabama Judicial Inquiry Commission opinion caused “self-censorship” on the part of the plaintiffs, if true, constituted First Amendment injury in fact); Sloman v. Tadlock, 21 F.3d 1462, 1470 (9th Cir.1994) (The jury “reasonably could have concluded that [plaintiffs] political activity was a substantial or motivating factor in [the police officer’s] decisions to issue a citation and warnings to him, that the claimed reasons for the citation and warnings were groundless, and that such police conduct chilled the political expression of [plaintiff] and his group. This is an adequate predicate to support liability against [the officer] under § 1983.”) (emphasis added). If Reyes can prove, as he has alleged, that his speech was chilled during the period after his indictment and before the ordinance was repealed, then he is entitled to nominal damages at the very least. See Carey v. Piphus, 435 U.S. 247, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978).
The majority explains that because Reyes was not harassed or arrested at the scene of the original protest on November 10, 1997, he cannot claim that his speech at that event was chilled. See ante at 455 note 8. The majority also notes that the ordinance was repealed on March 10, 1998, and thus concludes that Reyes was not deterred from participating in a planned protest on March 13. Id. I agree with both of these observations. Reyes cannot claim that his speech was chilled before he was indicted on December 1, 1997, or after the ordinance was repealed on March 10, 1998. Yet this leaves a three-and-a-half-month window between December 1, 1997, and March 10, 1998. In Reyes’s complaint, filed February 27, 1998, before the ordinance was repealed, he alleges that “[t]he fear of criminal prosecution has caused [him] to be deterred and chilled in the exercise” of his First Amendment rights of free speech and assembly. Clearly, Reyes is alleging not only that the fear of criminal prosecution will deter him from participating in the protest planned for March 13, 1998, but also that the pending criminal prosecution has already deterred and chilled him from speaking.
The majority concludes that “[u]nder the facts of this case, [it] find[s] no merit to” Reyes’ claim that his exercise of his First Amendment rights was chilled. However, what little we know about the facts of this case, at least with regard to whether and when Reyes’s speech was chilled, comes entirely from the allegations in Reyes’s complaint. I concede that Reyes does not allege in detail how his speech was chilled during the three and a half months between his indictment and the repeal of the ordinance. Under our system of notice pleading, however, great specificity is not *460 required: a complaint need only contain “a short and plain statement of the claim.” Fed.R.Civ.P. 8(a). In response to Reyes’s allegation that his speech had been chilled (as opposed to would be chilled in the future), the City of Lynchburg stated in its answer that “it is without knowledge or information sufficient to form a belief as to the truth” of this allegation. And in its motion for summary judgment, the City did not address, let alone contest, Reyes’s allegation that he had already suffered a chill to his First Amendment rights as a result of the prosecution. It is of course true that “a party opposing a properly supported motion for summary judgment may not rest upon the mere allegations or denials of his pleading.” Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (internal quotations omitted). Nevertheless, when a defendant has not contested an allegation with an affidavit or other evidentiary materials, a district court may not simply discount the allegation in deciding a motion for summary judgment. See Elbe v. Yankton Indep. School Dist. No. 1, 714 F.2d 848, 850 (8th Cir.1983) (For summary judgment purposes, “[ajllegations in a complaint, which are not contested by the moving party by affidavit or other eviden-tiary materials, are assumed true.”); Galvan v. Bexar County, Tex., 785 F.2d 1298, 1302 (5th Cir.1986).
The district court, like the majority, concluded that Reyes had failed to show that his First Amendment free speech rights were “sufficiently chilled to constitute a violation.” But the district court reached this conclusion on very different grounds than the majority. The district court acknowledged that “Reyes claims that the threat of future indictments for violating the City ordinance chilled his free speech.” The court went on to say, however, that “the ordinance did not prohibit Reyes from standing on a sidewalk by himself to proclaim his anti-abortion message.” The court also noted that “Reyes previously had protested in other areas of the City without so much as a warning from a police officer.” These observations are insufficient to overcome Reyes’s allegation that his constitutional rights had been chilled by the indictment and prosecution. The First Amendment, which provides for freedom of peaceable assembly as well as freedom of speech, protects Reyes’s right to speak from the public sidewalk in the company of a friend just as clearly as it protects his right to stand there and speak all alone. See NAACP v. Button, 371 U.S. 415, 430, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963) (“[Tjhere is no longer any doubt that the First and Fourteenth Amendments protect certain forms of orderly group activity.”). Nor is it clear to me why the district court thought that the fact that Reyes had engaged in prior protests without arrest or prosecution undermined his claim that his speech was chilled. Because Reyes had been indicted and was facing criminal prosecution, a reasonable fact-finder could certainly conclude that at least until March 10, 1998, when the ordinance was repealed, Reyes feared future punishment if he engaged in further protests. See Dombrowski v. Pfister, 380 U.S. 479, 487, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965) (“The chilling effect upon the exercise of First Amendment rights may derive from the fact of the prosecution, unaffected by the prospects of its success or failure.”).
In sum, apart from whether the majority is correct to adopt the holding in Richardson, summary judgment for the City was .inappropriate because Reyes has adequately alleged a constitutional injury in the form of chilled speech. He claims that the indictment and prosecution for his public protest “has caused [him] to be deterred and chilled” in the exercise of his First Amendment rights. This allegation, *461 framed in the past tense in a complaint filed February 27, 1998, can only be read to mean that Reyes’s speech was chilled in the period after his indictment on December 1, 1997, and before the ordinance was repealed on March 10, 1998. The City of Lynchburg did nothing to confront or contest this allegation in the summary judgment proceedings. Accordingly, the district court erred when it granted summary judgment to the City on the ground that there was no constitutional injury to support Reyes’s claim for nominal damages.
B.
The majority does not squarely rule on the Constitutionality of the ordinance. It holds that even if the ordinance is unconstitutional, Reyes has suffered no constitutional injury. Because I believe that summary judgment was inappropriate on the issue of constitutional injury, I must deal with whether the ordinance is in fact unconstitutional. I conclude that the ordinance is unconstitutional on its face because it is overbroad: it is not narrowly tailored to serve the substantial government interests asserted.
The first job is to determine the appropriate constitutional standard for reviewing the ordinance. The parties agree that the Lynchburg ordinance must satisfy the requirements for a time, place, and manner regulation, namely, that the ordinance must be content-neutral, “must be narrowly tailored to serve a significant governmental interest, and must leave open ample alternatives for communication.” Forsyth County, Ga. v. Nationalist Movement, 505 U.S. 123, 130, 112 S.Ct. 2395, 120 L.Ed.2d 101 (1992). In addition, the ordinance must “contain adequate standards to guide the official’s decision and render it subject to effective judicial review.” Thomas v. Chicago Park Dist., 534 U.S. 316, 122 S.Ct. 775, 780, 151 L.Ed.2d 783 (2002). The parties disagree, however, about whether the ordinance must also be analyzed to determine whether it is a prior restraint on speech subject to the procedural requirements set out in Freedman v. Maryland, 380 U.S. 51, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965). The Supreme Court has recently resolved this question, explaining that a permit or licensing scheme that “is not subject-matter censorship but content-neutral time, place, and manner regulation of the use of a public forum” is not subject to “the procedural requirements set forth in Freedman.” Thomas, 122 S.Ct. at 779-80. Reyes does not contend that the ordinance is content based, and a review of the ordinance confirms that it is content neutral. The ordinance indicates that the chief of police or his designee shall issue the permit unless the proposed conduct would “endanger the public health, welfare or safety,” as clarified by a list of specific concerns. Lynchburg, Va., Code art. X, § 25.374.3(a) (repealed March 10, 1998). As in Thomas, “[n]one of the grounds for denying a permit has anything to do with what a speaker might say.” Thomas, 122 S.Ct. at 779. Thus, the Lynchburg ordinance is not subject to the procedural requirements of Freedman.
The Freedman requirements aside, Reyes claims that the ordinance is unconstitutional both as applied to his conduct and on its face due to overbreadth. Because I believe that the ordinance is over-broad on its face, I will not address Reyes’s as applied challenge.[3] In the *462 First Amendment context, “an overbroad regulation may be subject to facial review and invalidation, even though its application in the case under consideration may be constitutionally unobjectionable.” Forsyth, 505 U.S. at 129. A challenge that an ordinance is facially overbroad is permitted when, among other things, “the ordinance sweeps too broadly, penalizing a substantial amount of speech that is constitutionally. protected.” Id. at 130. The majority reasons that because the ordinance has been repealed, it no longer reaches any amount of constitutionally protected conduct. Accordingly, the majority concludes that Reyes’s overbreadth challenge no longer presents a live case or controversy. I disagree. Reyes was indicted under the ordinance on December 1, 1997, and prosecuted in the following weeks and months. Reyes alleges that during the time before the ordinance was repealed, his speech was chilled because of this indictment and prosecution. If the ordinance was unconstitutional, Reyes suffered an injury to his First Amendment rights regardless of whether the constitutional infirmity was due to overbreadth or some deficiency in the application of the ordinance to him. This injury, if proven, entitles Reyes to nominal damages. Because Reyes has a live claim for nominal damages, whether the ordinance is unconstitutional, either on its face or as applied, remains a live issue. See Massachusetts v. Oakes, 491 U.S. 576, 585-88, 109 S.Ct. 2633, 105 L.Ed.2d 493 (1989) (Scalia, J., joined as to Part I by Blackmun, Brennan, Marshall, and Stevens, J.J., concurring in the judgment in part and dissenting in part) (repeal of statute under which defendant was convicted does not prevent him from making an overbreadth challenge to that statute); Ruff v. City of Leavenworth, Kansas, 858 F.Supp. 1546, 1555 (D.Kan. 1994); Richard H. Fallon, Jr., Making Sense of Overbreadth, 100 Yale L.J. 853, 856 (1991) (“Although the point is often lost sight of, First Amendment over-breadth doctrine has a constitutionally mandated core, involving the personal right of defendants not to be sanctioned except under a constitutionally valid rule of law.”). Because the question of damages remains a live issue, the City of Lynchburg should not be able to insulate its ordinance from overbreadth review simply by repealing it. While the City is correct that the ordinance, now repealed, will not chill any protected speech in the future, Reyes’s damages claim requires us to determine whether it did so in the past. See Comm. for the First Amendment v. Campbell, 962 F.2d 1517, 1526-27 (10th Cir.1992). Accordingly, I will now take up Reyes’s overbreadth challenge to the ordinance.
As noted above, the First Amendment requires that even a content-neutral permit scheme regulating speech in a public forum be “narrowly tailored to serve a significant governmental interest.” Forsyth, 505 U.S. at 130. Narrow tailoring in the First Amendment context does not require the government to regulate by using “the least restrictive or least intrusive means” available to achieve its goals, but it does prohibit the government from “regulating] expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals.” Ward v. Rock Against Racism, 491 U.S. 781, 798-99, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989). Similarly, when an ordinance “sweeps too broadly, penalizing a substantial amount of speech that is constitutionally protected,” it is unconstitu *463 tional due to overbreadth. Forsyth, 505 U.S. at 130.
The Lynchburg ordinance requires a permit for any planned “parade, picketing, meeting, assembly, rally, gathering, contest or other assemblage on the public streets, sidewalks, parks, squares or other public places.” Code § 25-374.1(a). The ordinance defines “assembly” as “any meeting, gathering or group of persons, animals, or vehicles or a combination thereof having a common purpose, design or goal.” Code § 25 — 374(b). “Picketing” is defined as “peaceful methods of expressing economic, social, political, religious and other issues to the public and which may or may not include the use of signs ... by more than one (1) person at a specific location.” Code § 25 — 374(c). The ordinance exempts certain activities such as “spontaneous events,” “jogging or walking,” and “funeral processions.” Code § 25-374.1(b).
As the City notes, the goals of the ordinance are apparent on its face. The ordinance is meant to protect the public health, welfare, and safety, specifically, by ensuring that any gathering will not unreasonably interrupt vehicular and pedestrian traffic, will not require a diversion “of so great a number” of fire and police personnel as to impair protection in other parts of the City, will be adequately monitored to ensure orderliness, will not interfere with police or ambulance service, and will not interfere with previously permitted events. Code § 25 — 374.3(a)(1)—(5). These government interests are significant and appropriate to take into account, and Reyes does not contend otherwise. See MacDonald v. City of Chicago, 243 F.3d 1021, 1034 (7th Cir.2001) (significant government interests include “the safety of citizens, and specifically the organized, effective, and safe flow of traffic, including emergency vehicles”). The only question is whether the ordinance is narrowly tailored to serve these interests.
On its face the ordinance encompasses a stunningly broad amount of speech and conduct. Among other things, it requires a permit for any planned gathering in any public place of more than one person (or, indeed, of one person and one or more animals or vehicles, § 25-374(b)) with a common purpose or goal, including but not limited to the expression of economic, social, political, religious or other issues to the public. Code §§ 25-374, 25-374.1. The ordinance as written thus covers about every conceivable type of preplanned social activity in a public place, such as playing fetch with a dog in the park (so long as the game is not spontaneous), meeting friends on a street corner for dinner, or standing with a friend on a city sidewalk holding signs reading “Vote Yes on the School Levy.”[4] However, even in a First Amendment facial challenge, courts look not only at the face of the challenged ordinance but also “consider the [government’s] authoritative constructions of the ordinance, including its own implementation and interpretation of it.” Forsyth, 505 U.S. at 131. The City of Lynchburg does not claim to have any authoritative regulations or guidelines that construe the ordinance, but it does point to its history of application of the ordinance, as evidenced by affidavits from city officials and a list of permits granted and denied in 1996 and 1997. It is clear, for example, that the City has never required a permit for a planned game of *464 fetch in a city park. The City argues that the evidence before the district court, including the list of recently permitted activities, makes it clear that the ordinance was applied in a manner that rendered it narrowly tailored to serve the interests identified in the ordinance and that left adequate alternative means of communication. The history of an ordinance’s application, without authoritative regulations or a judicial construction, can narrow the scope of an ordinance for the purposes of over-breadth analysis only when “a wellunder-stood and uniformly applied practice has developed that has virtually the force of a judicial construction.” City of Lakewood v. Plain Dealer Publ’g Co., 486 U.S. 750, 770 n. 11, 108 S.Ct. 2138, 100 L.Ed.2d 771 (1988). It is questionable whether the City’s implementation of the ordinance was so well known and uniformly applied as to have “virtually the force” of judicial construction. Nonetheless, even if the City’s argument about narrow implementation is accepted, the ordinance is still unconstitutional.
The City could, of course, require a permit for some of the activities covered by the ordinance without running afoul of the Constitution. These include, for example, the Thousand Man Watch proposed by the Coalition of Concerned African American Men and the Walk a Thon proposed by the March of Dimes. It is apparent from their very names that these activities would likely involve large numbers of people gathering in public places. Such events might reasonably be said to pose legitimate government concerns recognized by the ordinance, such as the impact on pedestrian and vehicle traffic and the potential diversion of police and fire protection from certain parts of the City. See, e.g., Coalition for the Abolition of Marijuana Prohibition v. City of Atlanta, 219 F.3d 1301, 1318 (11th Cir.2000) (permit requirements narrowly tailored to fit city’s interests in security, sanitation, and traffic control at event involving around 30,000 participants). However, the City has also issued permits for activities such as informational picketing relating to public mental health issues, picketing by the National Association of Letter Carriers, distribution of New Testaments on the public sidewalk by a local chapter of the Gideons, public protests of gay discrimination, and engaging in “public ministry.” The permit list does not reveal the exact size of all of these events or activities, but the record suggests that at least some of them were quite small. Indeed, the City routinely granted permits to lone protesters, such as one man who planned to protest against the United States government at a City intersection, even though the protester indicated that in all likelihood he would be there by himself. Jack Lewis, an officer in the Lynchburg Police Department responsible for issuing permits under the ordinance, testified that in his opinion two people picketing in any public place would require a permit. In contrast, he indicated that two people walking down the street discussing religion would not need a permit. Officer Lewis also indicated that a group of four people standing on the sidewalk outside an abortion clinic declaring their opposition to the practice of abortion would likewise require a permit under the ordinance. In contrast, a group of four people playing horseshoes in the park would not need a permit, even if the event was preplanned. Officer Lewis testified that if someone inquired about a permit, he would probably have that person fill out an application and grant approval for the activity if there was any question that the proposed activity might fall within the ordinance.
I accept the City’s representations, which are supported by testimony and the list of permitted activities, that it does not apply the permit ordinance to activities such as playing horseshoes in a public park or discussing religion while walking down *465 the street. Still, the list of activities for which permits have been issued and the testimony describing those activities for which permits would be required demonstrates that the City’s application of the ordinance does not come close to rendering it narrowly tailored to achieve the stated goals of preventing interruption of vehicular and pedestrian traffic, maintaining public order, and ensuring adequate monitoring by police and fire department officials. Two peaceful picketers quietly handing out leaflets or holding signs on a sleepy sidewalk or in the middle of a public park pose no threat to vehicular or pedestrian traffic or to public order and require little or no attention from police and fire officials. See, e.g., Grossman v. City of Portland, 33 F.3d 1200, 1205-08 (9th Cir.1994) (ordinance requiring permit for any organized demonstration in a public park not narrowly tailored to serve city’s interests; ordinance was applied to groups of peaceful protesters as small as eight); Community for Creative Non-Violence v. Turner, 893 F.2d 1387, 1392 (D.C.Cir.1990) (CCNV) (regulation requiring permit for two or more people speaking together in any above-ground areas of the Metro held not narrowly tailored; “it is clear that many of these activities would not interfere meaningfully with WMATA’s asserted interests.”).
It is of no moment that the City routinely granted permits for benign gatherings of only a few people. “Both the procedural hurdle of filling out and submitting a written application, and the temporal hurdle of waiting for the permit to be granted may discourage potential speakers.” Grossman, 33 F.3d at 1206. See also CCNV, 893 F.2d at 1396-97 (Williams, J., concurring in the judgment) (“WMATA has imposed only a license requirement, not an outright ban. But this is not enough to save it.... [No government interest] would justify requiring the lone button wearer to go to WMATA’s office for a permit”). The Lynchburg ordinance, as implemented by the City, was not narrowly tailored to fit the legitimate interests of maintaining order, the smooth flow of traffic, and the like. Rather, both as actually implemented and as interpreted by City officials, the ordinance “sweeps too broadly, penalizing a substantial amount of speech that is constitutionally protected.” Forsyth, 505 U.S. at 130. Accordingly, I would hold that the ordinance is unconstitutionally overbroad.
Because the ordinance, even as implemented by the City, clearly fails the narrow tailoring test, I will not address whether it meets the additional requirement of “leav[ing] open ample alternatives for communication.” Id. I note in passing that the ordinance covers every public place, so it is hard to imagine that the ordinance permits adequate alternatives for communication. The City suggests that adequate alternatives exist insofar as Reyes is free to send letters to the editor or to protest on the sidewalk by himself. Although Reyes is certainly free to pursue these methods of communication, the City cannot seriously claim that it can therefore banish groups from speaking in any public place, or require permits for them to do so.
Accordingly, I would hold that the Lynchburg ordinance was unconstitutional because, even as implemented by the City, it was not narrowly tailored to serve the City’s interests. Because Reyes alleged that his speech was chilled as a result of his indictment and prosecution under this unconstitutional ordinance, and because the City has made no effort to rebut this allegation, summary judgment should not have been granted to the City on Reyes’s claim for nominal damages under § 1983.
I respectfully dissent.

. Reyes also alleges, like the plaintiffs in Richardson, that defending against the prosecution was itself a constitutional injury. However, because Reyes alleges other constitutional injuries, this is not a case “where no deprivation other than that suffered as a result of maintaining a legal defense is sustained by the party prosecuted.” Richardson, 904 F.2d at 1051.

. Because Reyes adequately alleged constitutional injury in the form of chilled speech, this case does not require a decision. on' whether to adopt Richardson's holding that defending against prosecution under an unconstitutional ordinance does not amount to constitutional injury. Incidentally, the Richardson holding prompted a vigorous dissent. See Richardson, 904 F.2d at 1055-58 (Merritt, C.J., dissenting). And it appears that not all courts follow the approach of the Richardson majority. See, e.g., Faustin v. City and County of Denver, 268 F.3d 942, 947-48 (10th Cir.2001) (First Amendment plaintiff "has standing to sue for .damages based on her prosecution (including nominal damages, which she sought)” even though "the section 3-1 [bill posting] charge against Faustin was dismissed ... and she is not being prosecuted under section 3-1 at this time.”).

. The factual record as it currently stands is not sufficient to determine whether the ordinance, as it was applied to Reyes, met the requirements for a time, place, and manner regulation. It is unclear, for example, how many people were protesting with Reyes, *462 where they were located in relation to the school, or how heavy the pedestrian traffic was in this area. Accordingly, an as applied time, place, and manner analysis would require a remand to the district court for further factual development.

. It is reasonable to wonder whether the ordinance would require a group of racoons to obtain a permit to rummage through garbage bins in an alley. While such a group would constitute an ''assembly” under § 25-374(b) (a "group of ... animals ... having a common purpose ... upon any public ... alley”), the ordinance only prohibits a person from conducting or participating in an assembly without a permit. Code § 25-374.1(a).