**Fred NEMO et al., Plaintiffs,**

v.

**CITY OF PORTLAND, Rob Burks, and Pioneer Courthouse Square of Portland, Inc., Defendants.**

**No. CV–94–1553–ST.**

United States District Court, District of Oregon.

Dec. 12, 1995.

---

7. Plaintiff's Response Brief, page 31, lines 20–25.

8. Opinion and Order, March 7, 1994, page 10.

Spencer M. Neal, Ginsburg & Neal, Portland, OR, for Fred Nemo, Douglas Squirrel, Anna Helena Decastro, Karl Anderson, Tobias Sheppard Bloch, William Holloway, Daniel Huisjen, Leanna Kocka, Stephanie Larkin, John Peterson, John Rivera, Tom Sedlack, Peter Siracusa, Kyle Vanderlaan, Aaron Van Delip, Theo Ward.

Harry Michael Auerbach, City Attorneys Office, Portland, OR, for City of Portland, Rob Burks, Pioneer Courthouse Square of Portland Inc.

## OPINION

STEWART, United States Magistrate Judge:

### *INTRODUCTION*

Plaintiffs [1] are sixteen members of an association of bicyclists called Critical Mass. They brought this action under 42 U.S.C. § 1983 against defendants City of Portland ("City"), Rob Burks ("Burks"), and Pioneer Courthouse Square of Portland, Inc. ("Pioneer Courthouse Square, Inc.") alleging that their exclusion from Pioneer Courthouse Square ("Square"), a City park, under either a City ordinance or a Square policy violated their civil rights under the First and Fourth Amendments to the United States Constitution. They seek compensatory damages from the City, compensatory and punitive damages from both Pioneer Courthouse Square, Inc. and Burks, as well as a declaratory judgment that the City ordinance and Square policy are unconstitutional.

This court has jurisdiction under 28 U.S.C. § 1331.

Defendants move this court for summary judgment in their favor on all claims (docket # 41). Plaintiffs cross-move for partial summary judgment on the issue that the City ordinance and Square policy are unconstitutional under the First Amendment (docket # 49).

All parties have consented to allow a Magistrate Judge to enter final orders and judgment in this case in accordance with FRCP 73 and 28 U.S.C. § 636(c).

---

1. Named plaintiffs are: Fred Nemo, Douglas Squirrel, Anna Helena Decastro, Karl Anderson, Tobias Sheppard Bloch, William Holloway, Daniel Huisjen, Leanna Kocka, Stephanie Larkin, John Peterson, John Rivera, Tom Sedlack, Peter Siracusa, Kyle Vanderlaan, Aaron Van Delip, and Theo Ward.

## *UNDISPUTED FACTS*

Members of Critical Mass engage in mass bicycle rides through the streets of Portland in an effort to educate the public about the importance of using bicycles as a means of public transportation. On October 28, 1994, plaintiffs engaged in an advertised mass bicycle ride that terminated at the Square, a City park consisting of one square block in downtown Portland. Pursuant to a Management Agreement with the City (authorized by City Ordinance 155107), Pioneer Courthouse Square, Inc. manages the Square. When the group of 20–30 bicyclists reached the Square, some of them congregated together to discuss the success of the ride while others broke away from the group.[2] A few handed out leaflets to interested bystanders. Burks, the staff person in charge of the Square, believed that plaintiffs were engaged in an organized event at the Square and that they needed a permit to do so. He approached the group and asked to speak to its leader. Because the group had no leader no one came forward, although one member handed Burks a flyer outlining their political objectives. Burks informed the group that they had to either obtain a permit or leave the Square. He offered to process and issue a permit on the spot. The fee to obtain a permit is $25.00. When plaintiffs refused to apply for a permit or leave the Square, City police officers detained plaintiffs until each one could be issued an order excluding them from entering the Square for 30 days.

## *STANDARDS*

FRCP 56(c) authorizes summary judgment if no genuine issue exists regarding any material fact and the moving party is entitled to judgment as a matter of law. The moving party must show an absence of an issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). Once the moving party shows the absence of an issue of material fact, the nonmoving party must go beyond the pleadings and designate specific facts showing a genuine issue for trial. *Id.* at 324, 106 S.Ct. at 2553. A scintilla of evidence, or evidence that is merely colorable or not sig-

nificantly probative, does not present a genuine issue of material fact. *United Steelworkers of Am. v. Phelps Dodge ·Corp.,* 865 F.2d 1539, 1542 (9th Cir.), *cert. denied,* 493 U.S. 809, 110 S.Ct. 51, 107 L.Ed.2d 20 (1989).

The substantive law governing a claim or defense determines whether a fact is material. *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n,* 809 F.2d 626, 630 (9th Cir.1987). The court must view the inferences drawn from the facts in the light most favorable to the nonmoving party. Thus, reasonable doubts about the existence of a factual issue should be resolved against the moving party. *Id.* at 630–31. However, when the nonmoving party's claims are factually implausible, that party must come forward with more persuasive evidence than would otherwise be required. *California Architectural Bldg. Prods., Inc. v. Franciscan Ceramics Inc.,* 818 F.2d 1466, 1470 (9th Cir. 1987), *cert. denied,* 484 U.S. 1006, 108 S.Ct. 698, 699, 98 L.Ed.2d 650 (1988). The Ninth Circuit has stated, "No longer can it be argued that any disagreement about a material issue of fact precludes the use of summary judgment." *Id.* at 1468.

## *DISCUSSION*

### I. *RESTRICTIONS ON FREE SPEECH*

■ Plaintiffs claim that they were excluded from the Square as a result of the enforcement of either an unconstitutional City ordinance or an unconstitutional Square policy which required a permit. Defendants claim that plaintiffs were excluded from the Square for failure to follow the reasonable order of a park official to obtain a permit as required by the Square policy, and that the City ordinance was not implicated.

The ordinance promulgated by the City provides that:

It is unlawful for any person to conduct or participate in any organized event in a park without the written permission of the Commissioner In Charge of the Bureau of Parks or the Council. As used in this Chapter, "organized event" is any use which is open and advertised to the public

---

**2.** The parties disagree as to whether or not plaintiffs were in the process of dispersing.

or for which the park is not normally designated. Portland City Code ("PCC") 20.08.010.[3]

The policy of the Square, on the other hand, is to require a permit for any "event" on the Square. The policy defines an "event" as "any activity involving a group of four or more persons who appear to be acting together and who are soliciting the public's attention." Pioneer Courthouse Square Security Administrative Reference Manual ("Manual"), pp. 9–10, attached as Exhibit D to Plaintiffs' Cross–Motion for Summary Judgment ("Cross–Motion").

Regardless of whether the City ordinance applies to the Square, the record indicates that it was not enforced against plaintiffs. Both Burks and the former executive director of the Square, Linda Brady Johnson, testified that the Square routinely requires a permit only from groups of four or more who appear to be acting together and soliciting the public. *See* Affidavit of Linda Brady Johnson, ¶ 10; Deposition of Linda Brady Johnson ("Johnson Depo."), p. 21; Deposition of Wayne Burks ("Burks Depo."), p. 19. When requiring a permit, Square employees apparently do not consider the criteria defining an "organized event" set forth in the City ordinance. Thus, this court need not address the constitutionality of the City ordinance.

As noted above, the Square requires a permit for "any activity involving a group of four or more persons who appear to be acting together and who are soliciting the public's attention."[4] Because the Square is a public park, it constitutes a "quintessential" public forum for First Amendment purposes. *See Grossman v. City of Portland*, 33 F.3d 1200, 1204 (9th Cir.1994). Public fora "have achieved a special status in our law" for they "represent areas within which tolerance for inhibitions on speech, petition, and assembly is at a minimum." *N.A.A.C.P. v. City of Richmond*, 743 F.2d 1346, 1355 (9th Cir. 1984). The government therefore "bear[s] an extraordinarily heavy burden to regulate speech in such locales." *Id.*

The government is permitted to impose restrictions on the time, place, and manner of protected speech only if the restrictions are (1) content neutral, (2) narrowly tailored to serve a significant governmental interest, and (3) leave open ample alternative channels of expression. *Ward v. Rock Against Racism*, 491 U.S. 781, 791, 109 S.Ct. 2746, 2753, 105 L.Ed.2d 661 (1989); *Grossman*, 33 F.3d at 1205. The failure to satisfy any one of the prongs in this test invalidates the restriction. *Grossman*, 33 F.3d at 1205.

Plaintiffs first argue that the Square policy is not content neutral because it targets only those persons "soliciting the public's attention," effectively singling out political speech. However, the policy is facially content neutral and could apply to any group of four persons attempting to attract the attention of a crowd. In fact, it does not necessarily target political speech at all, since it would include such commercial speech as soliciting the public to hand out sample products. Thus, the policy meets the first prong of the test.

The second prong of the test requires that the policy be "narrowly tailored to serve a significant government interest." Here the Square's policy runs into difficulty.

Defendants list several important interests to justify the permit policy. These include

---

3. A prior version of this ordinance was held to be unconstitutional in 1994. *Grossman v. City of Portland*, 33 F.3d 1200 (9th Cir.1994). That version stated that it was unlawful for any person "to conduct or participate in any organized entertainment, demonstration, or public gathering, or to make any address, in any park" without a written permit. *See id.* at 1203. The Ninth Circuit struck down the ordinance on the basis that it was not narrowly tailored to serve a substantial government interest. *Id.* at 1207–08.

4. The Square's Manual also requires a permit for any "organized activity" on the Square. "Organized activity" is defined as "[f]our or more persons acting together or affiliated with a known movement, demonstration or organization...." Manual, p. 10. The court notes that this provision is inconsistent with, and even more troublesome than, the Square's policy requiring a permit for four or more persons who are soliciting the public's attention. However, the deposition and affidavit testimony of Burks and Johnson indicates that this version of the policy is not enforced. Because this version was not enforced against plaintiffs, the court will not address its constitutionality.

avoiding excess noise, keeping the Square attractive, identifying a person responsible for the activity, notifying users of Square rules, managing competing uses, and ensuring safety. Most of these interests can be furthered through means other than the permit policy. For instance, ensuring a low noise level and attractive appearance can be accomplished through existing City ordinances regulating noise, litter, and graffiti; users can be notified of Square rules simply by posting them; and if the Square needs to identify a person responsible for the event, it need only request a name and address from one of the organizers. Therefore, the most compelling reasons for the permit policy are the City's interests in managing the competing uses in this small park and maintaining safety.

However, it is not at all clear that the policy as written is narrowly tailored to accomplish these goals. In particular, requiring a permit for "four or more persons," as opposed to six or eight or more persons, appears to be completely arbitrary. Defendants explained during oral argument that the line was drawn at four persons in response to the Ninth Circuit's opinion in *Grossman*. There, the court determined that a permit should not have been required for six to eight persons protesting together in Waterfront Park, a City park much larger than the Square. *Id.* at 1207. Defendants reason that since the Square is much smaller than Waterfront Park, requiring a permit for a group fewer than six persons is appropriate.

This court can see no rational relationship between the stated interests of managing competing uses and maintaining safety and a permit requirement for "four or more" persons who are "soliciting the public's attention." The City's interests are directed more toward the size of the crowd the event is likely to attract to the Square, rather than toward the number of organizers. In fact, it is just as likely that three people or fewer can coordinate a large public event which will interfere with other patrons' use of the Square.

As the Ninth Circuit acknowledged in *Grossman,* "[s]ome type of permit require-ment *may* be justified in the case of large groups, where the burden placed on park facilities and the possibility of interference with other park users is more substantial." *Id.* at 1206 (emphasis in original). Without commenting as to their constitutionality, the Ninth Circuit cited several city ordinances which it deemed to be "more narrowly tailored" than the ordinance at issue. *Id.* at 1207, n. 13. Three of these were dependent upon the size of the crowd the event was likely to attract. The Fullerton, California, city code required permits for events "attended ... by more than one hundred fifty teenage or older people"; Palm Springs, California, required a permit for an event of "fifty or more persons"; and the San Francisco Park Code required a permit for certain events involving fifty or more persons at the same time within an area circumscribed by a 500–foot radius. *Id.*

The court is cognizant of the difficulty in drafting a narrowly tailored permit procedure which satisfies the City's legitimate interests. However, defining an "event" as a "group of four or more persons" acting together to solicit the public's attention is too broad. A more narrowly tailored permit policy designed to effectively manage the competing uses and safety at the Square would focus on the size of the crowd the event is likely to attract, instead of on the number of organizers. Other appropriate considerations would be the size of the space to be used and the duration of the event. It seems unnecessary to require a permit for four people "soliciting the public" by handing out flyers if they are just passing through the Square. Under a more narrowly tailored permit procedure focused on the size of the crowd and other considerations, the gathering of plaintiffs may still have required a permit, but that is not the issue here.

■ Defendants correctly point out that while "a regulation of the time, place, or manner of protected speech must be narrowly tailored to serve the government's legitimate content-neutral interests ... it need not be the least restrictive or least intrusive means of doing so." *Ward,* 491 U.S. at 798, 109 S.Ct. at 2757. However, it is even more important that the regulation not "burden

substantially more speech than is necessary to further the government's legitimate interests. Government may not regulate expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals." *Id.* at 799, 109 S.Ct. at 2758. Defendants admit that the policy as written and enforced would require a permit for four Boy Scouts in uniform to parade around the Square with the American flag. Burks Depo., p. 21. A group of 100 people gathering at the Square to eat lunch together, on the other hand, would not be required to obtain a permit, assuming that they were not soliciting the public's attention (Johnson Depo., p. 37), even though it is clear that 100 people would interfere with others' use and enjoyment of the Square more dramatically than the Boy Scouts' patriotic display. Similar to the ordinance in *Grossman,* the Square's permit policy precludes, rather than merely burdens, speech:

> In addition, the City's stated interests and the burden that the park ordinance imposed on speech do not sufficiently match. Consider this: if Dr. Grossman and his companions had been standing in a group in the park after meeting unexpectedly, and had been discussing gardening, or the Portland Trailblazers, the doctor would not have been arrested. While the addition of signs—or T-shirts, or an "address"—would have occasioned the application of [the permit ordinance], the distinctions are absolutely empty in terms of the ordinance's stated goals. A group of 100 family members and friends could have had a noisy picnic in the park secure in the knowledge that they would be unimpeded by law enforcement officers, while Dr. Grossman's small group silently carrying signs or wearing T-shirts would have been classified as law-breakers and subject to forcible removal by armed police. It is when persons gathered in order to speak that the ordinance was most readily triggered. In short, the ordinance did not simply burden speech; it discriminated against speech. Rather than being narrowly tailored to protect speech, as it should have been, it was tailored so as to preclude speech.

*Grossman,* 33 F.3d at 1206–07.

The required permit fee also is troublesome. The Square apparently charges a $25.00 permit fee for any event, regardless of the size of the crowd it may draw or the space it may require. While most of the cases addressing this issue involve parade permits, they suggest that a permit fee for the exercise of First Amendment rights is appropriate only if it is reasonably related to the extra costs attributable to it.

In *Cox v. State of New Hampshire,* 312 U.S. 569, 61 S.Ct. 762, 85 L.Ed. 1049 (1941), the Supreme Court upheld a permit fee which ranged from $300 to a nominal amount, depending on the "expense incident to the administration of the act and to the maintenance of public order . . . ." *Id.* at 577, 61 S.Ct. at 766. Two years later, the Court struck down a license fee on door-to-door sales in part because "the license tax is fixed in amount and unrelated to the scope of the activities of petitioners . . . ." *Murdock v. Commonwealth of Penn.,* 319 U.S. 105, 113, 63 S.Ct. 870, 875, 87 L.Ed. 1292 (1943). While the Ninth Circuit has not yet addressed the issue of permit fees for the use of public parks, it has commented in *dicta* that "[k]eeping order in the streets and parks is generally a public responsibility to be carried by the public at large and there is difficulty in determining which costs are appropriately attributable to a special event and which are appropriately general public responsibility." *Kaplan v. County of Los Angeles,* 894 F.2d 1076, 1081 (9th Cir.), *cert. denied,* 496 U.S. 907, 110 S.Ct. 2590, 110 L.Ed.2d 271 (1990).

■ Further, while the Square may consider the $25.00 fee to be a nominal amount, there apparently is no provision for waiver of the fee for poor or indigent persons nor for payment of reasonable clean-up costs attributable to a large affluent group. The Ninth Circuit has emphasized the importance of keeping public fora available to everyone, particularly those who are not privileged, because "parks provide a free forum for those who cannot afford newspaper advertisements, television infomercials, or billboards." *Grossman,* 33 F.3d at 1205. Even though a restriction may be facially neutral, the court must "examine restrictions on

speech with particular care when their effects fall unevenly on different ... groups in society." *N.A.A.C.P. v. City of Richmond,* 743 F.2d 1346, 1356 (9th Cir.1984).

Until recently, the Square provided a "Free Speech" corner, which was open to individuals for free expression on a first-come, first-served basis. No fee was required for the use of this space. However, the Square's policy regarding the "Free Speech" area was enjoined as unconstitutional on November 22, 1995. *Rohman v. City of Portland,* 909 F.Supp. 767 (Dist.Or.1995). The effect of this injunction is to extend the Square's permit policy into the area which was formerly available for the exercise of First Amendment rights free of charge.

For the reasons set forth above, this court finds that the Square's permit policy is unconstitutional because it is not narrowly tailored to serve a significant government interest. Accordingly, this court need not consider whether alternative channels of expression are available.

## II. *LIABILITY*

■ Having determined that the Square's permit policy is unconstitutional, this court now turns to the issue of liability. Plaintiffs seek compensatory damages from the City and compensatory and punitive damages from the private party defendants, Pioneer Courthouse Square, Inc., and Burks. The City concedes that it is liable for its custom and practice of enforcing the Square's policies. *See Monell v. Department of Social Services of the City of New York,* 436 U.S. 658, 690–91, 98 S.Ct. 2018, 2035–36, 56 L.Ed.2d 611 (1978). However, Burks and Pioneer Courthouse Square, Inc., argue that they should be shielded from liability because they acted in good faith reliance on the Square's policy.

By Opinion and Order dated July 25, 1995, this court held that the defense of qualified immunity was unavailable to Burks and Pioneer Courthouse Square, Inc. based on Ninth Circuit precedent that private defendants are not entitled to qualified immunity in § 1983 actions. *Conner v. City of Santa Ana,* 897 F.2d 1487, 1492 n. 9 (9th Cir.), *cert. denied,*

498 U.S. 816, 111 S.Ct. 59, 112 L.Ed.2d 34 (1990); *F.E. Trotter, Inc. v. Watkins,* 869 F.2d 1312, 1318 (9th Cir.1989). However, under the Supreme Court's decision in *Wyatt v. Cole,* 504 U.S. 158, 169, 112 S.Ct. 1827, 1834, 118 L.Ed.2d 504 (1992), private defendants might be entitled to a defense of good faith reliance upon a statute, even though such defendants cannot assert qualified immunity.

■ Although the qualified immunity and good faith defenses are quite similar, "[b]eneath the nomenclature lie considerations of substance." *Wyatt,* 504 U.S. at 173, 112 S.Ct. at 1836 (J. Kennedy, concurring). The qualified immunity defense, unlike the good faith defense, implies that the underlying conduct was unlawful, requires objective good faith rather than a subjective belief of good faith, and is a legal inquiry amenable to summary disposition if the facts are undisputed. Comparing the two defenses, Justice Kennedy explained:

It is true that good faith may be difficult to establish in the face of a showing that from an objective standpoint no reasonable person could have acted as the defendant did, and in many cases the result would be the same under either test.... That does not mean, however, that we may deprive plaintiffs of the opportunity to make their case. In some cases, eliminating the defense based on subjective good faith can make a real difference and again the instant case of alleged reliance on a statute deemed valid provides the example. It seems problematic to say that a defendant should be relieved of liability under some automatic rule of immunity if objective reliance upon a statute is reasonable but the defendant in fact had knowledge of its invalidity. Because the burden of proof on this question is the plaintiff's, the question may be resolved on summary judgment if the plaintiff cannot come forward with facts from which bad faith can be inferred. But the question is a factual one, and a plaintiff may rely on circumstantial rather than direct evidence to make his case.... The rule of course also works in reverse, for the existence of a statute thought valid ought to allow a defendant to argue that he

acted in subjective good faith and is entitled to exoneration no matter what the objective test is.

*Id.* at 173–74, 112 S.Ct. at 1836–37 (citation omitted).

 Despite these practical differences between the two defenses, the analysis of both is premised on a private actor stepping into the shoes of a governmental agent. Burks' position as a Square employee can be analogized to that of a police officer. Police officers are permitted to rely in good faith on the ordinances promulgated by their employer, the municipality. *See Grossman,* 33 F.3d at 1209.[5] In *Grossman,* the Ninth Circuit declined to hold a police officer liable for enforcing an unconstitutional ordinance, reasoning that "when a city council has duly enacted an ordinance, police officers on the street are ordinarily entitled to rely on the assumption that the council members have considered the views of legal counsel and concluded that the ordinance is a valid and constitutional exercise of authority ... [unless the ordinance] is patently violative of fundamental constitutional principles." *Id.*

Burks similarly should be allowed to rely on the Square policy. Because the policy was adopted by his employer, Pioneer Courthouse Square, Inc., and was not patently unconstitutional, Burks was entitled to assume that the policy he was enforcing was constitutional. In fact he had a duty to enforce his supervisors' edict in performing his job. Plaintiffs have not submitted any evidence from which it may be inferred that Burks acted in bad faith. Thus, Burks is entitled to summary judgment in his favor.

 Pioneer Courthouse Square, Inc., on the other hand, presents an unusual situation. Pioneer Courthouse Square, Inc. claims that it relied in good faith upon the validity of its own policy, rather than upon a statute or ordinance enacted by a governmental entity. If Pioneer Courthouse Square, Inc. had no policy and relied in good faith upon the City's permit ordinance which it believed to be constitutional, then it would not be liable to plaintiffs. Instead, it promulgated its own policy which presumably was ratified by the City Council.[6] Thus, it is unclear whether Pioneer Courthouse Square, Inc. was acting simply as a governmental entity or as an agent of another governmental entity. Given that it adopted the policy at issue, which its employees were to enforce, this court believes that it is more appropriate to analogize Pioneer Courthouse Square, Inc. to that of a governmental entity. By standing in the shoes of the City, Pioneer Courthouse Square, Inc., cannot claim that it relied in good faith on its own policy. Just as a municipality cannot escape liability for its own unconstitutional ordinances, *see Monell,* Pioneer Courthouse Square, Inc., a quasi-municipality for purposes of this analysis, cannot escape liability by claiming reliance in good faith on its own policy.

Thus, the City of Portland and Pioneer Courthouse Square, Inc., are liable to plaintiffs for damages for enforcing the unconstitutional Square policy, while Burks is entitled to summary judgment based on his good faith reliance on that policy.

Defendants' Motion for Summary Judgment (docket # 41) and Plaintiffs' Cross–Motion for Summary Judgment (docket # 49) are therefore GRANTED in part and DENIED in part, as set forth in the accompanying Order.

---

5. "[W]here a police officer has probable cause to arrest someone under a statute that a reasonable officer would believe is constitutional, the officer will be immune from liability even if the statute is later held to be unconstitutional." *Id.*

6. While nothing in the record verifies that the policy was ratified by the City Council, this court assumes that it was, given that the Management Agreement required that the Square's permit policy "be drafted by a Board-appointed committee [and] approved by the City Council." Exhibit 1 to Affidavit of Linda Brady Johnson, p. 15.