**Angelique YEAKLE and Teresa Sheffer, Plaintiffs,**

v.

**CITY OF PORTLAND and Pioneer Courthouse Square of Portland, Inc. Defendants.**

**No. Civ. 02–1447–HA.**

United States District Court, D. Oregon.

Feb. 26, 2004.

Edward Johnson, Marc E. Jolin, Portland, Oregon, for Plaintiffs.

William W. Manlove, Harry Auerbach, City Attorney's Office, Portland, Oregon, for Defendants.

## OPINION AND ORDER

HAGGERTY, Chief Judge.

On October 25, 2002, plaintiffs filed this complaint under 42 U.S.C. § 1983 alleging violations of their civil rights. Plaintiffs' Amended Complaint asserts that, on its face and as applied to them, Portland City Code (PCC) 20.12.265 is unconstitutional because it deprives plaintiffs of rights to freedom of speech and expression guaranteed by the First Amendment, and of rights to procedural and substantive due process guaranteed by the Fourteenth Amendment. Plaintiffs seek declaratory relief and money damages. On July 14, 2003, the parties filed Cross–Motions for Summary Judgment (Docs.# 30, 33). These motions are currently before the court.

## FACTUAL BACKGROUND

On April 22, 2002, plaintiffs were collecting signatures in Pioneer Courthouse Square (Square) regarding the use of medical marijuana. Plaintiff Yeakle was carrying a sign in support of her cause. She decided to go to the nearby Starbucks to get a cup of coffee and placed the sign on the "Rain Man" statute in the Square. Yeakle contends that she did not hand the sign to plaintiff Sheffer because Sheffer, who was in a wheelchair, had her assistance animal's leash in one hand and a clipboard for signatures in the other.

When Yeakle returned, Portland Police Officer Mace Winter and Portland Patrol Inc. (PPI) Officer Elmer Button approached plaintiffs. Officer Winter issued Yeakle a citation for $300 for violating PPC 20.12.030 ("Advertising and Decorative Devices").[1] Officer Button then issued both plaintiffs Notices of Exclusion from Pioneer Courthouse Square, O'Bryant Park, and the South Park Blocks for thirty days. The exclusion ordinance states in pertinent part:

> "[A]ny peace officer ... may exclude any person who violates any provision of this Code, any City ordinance, any of the laws of the State of Oregon, any ordinance adopted by the Tri–County Metropolitan Transportation District of Oregon (Tri–Met) governing any Tri–Met facility in any park, or any rule or regulation duly made and issued by the Commissioner In Charge of the Bureau of Parks or by the City Council from any City park for a period of not more than

---

1. PCC 20.12.030 provides: "On any tree, shrub, fence railing, fountain, wall, post, vase, statute, bridge, monument or other structure in any park, it is unlawful for any person to place any structure, sign, bulletin board, or advertising device of any kind, or to erect any post or pole or attach any notice, bill, poster, sign, wire, rod or cord."

30 days.... A person receiving such notice may appeal to the Code Hearings Officer ... within 5 days of receipt of the exclusion notice, unless extended by the Code Hearings Officer for good cause shown ... At any time within the 30 days, a person receiving such notice may apply in writing to the Commissioner In Charge of the Bureau of Parks for a temporary waiver from the effects of the notice for good reason."

PCC 20.12.265.

Plaintiffs were excluded from the Square, Ankeny Plaza, and the South Park Blocks for 30 days. Plaintiffs allege that these exclusions prevented them from collecting signatures and having their message heard in these public places in violation of their rights under the First and Fourteenth Amendments. Plaintiffs attempted to appeal their exclusions but were told that their appeal was not timely. Plaintiffs did not seek a temporary waiver of their exclusions. Yeakle went to traffic court to contest the $300 fine. Judge Harold Blank found her guilty of violating PCC 20.12.030 but reduced her fine to zero.

## STANDARDS

### 1. Summary Judgment

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Summary judgment is not proper if factual material exists for trial. *Warren v. City of Carlsbad,* 58 F.3d 439, 441 (9th Cir.1995).

The moving party has the burden of establishing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the moving party shows the absence of a genuine issue of

material fact, the nonmoving party must go beyond the pleadings and identify facts that show a genuine issue for trial. *Id.* at 324, 106 S.Ct. 2548. Assuming there has been sufficient time for discovery, summary judgment should be entered against a "party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322, 106 S.Ct. 2548.

Special rules of construction apply to evaluating summary judgment motions: (1) all reasonable doubts as to the existence of genuine issues of material fact should be resolved against the moving party; (2) all inferences to be drawn from the underlying facts must be viewed in the light most favorable to the nonmoving party; and (3) the court must assume the truth of direct evidence set forth by the nonmoving party if it conflicts with direct evidence produced by the moving party. *T.W. Elec. Serv. v. Pac. Elec. Contractors,* 809 F.2d 626, 630 (9th Cir.1987). When different ultimate inferences can be reached, summary judgment is not appropriate. *Sankovich v. Life Ins. Co. of N. Am.,* 638 F.2d 136, 140 (9th Cir.1981).

The issue of material fact required by Rule 56 to entitle a party to proceed to trial does not need conclusive resolution in favor of the party asserting its existence. Rather, all that is required is sufficient evidence supporting the claimed factual dispute to require a trier of fact to resolve the parties' differing versions of the truth at trial. *Id.* At the summary judgment stage, the judge does not weigh conflicting evidence or decide credibility. Those determinations are the province of the factfinder at trial. *Id., see also Abdul–Jabbar v. Gen. Motors Corp.,* 85 F.3d 407, 410 (9th Cir.1996) (on a motion for summary judgment, the court does not weigh the evidence or determine the truth of the matter

asserted, but decides only whether there is a genuine issue for trial).

### 2. 42 U.S.C. § 1983

42 U.S.C. § 1983 creates a cause of action against a person who, while acting under the color of state law, deprives another of guaranteed constitutional rights. It is a vehicle whereby plaintiffs can challenge the actions of government officials. There is no *respondeat superior* liability under § 1983; there must be a showing of personal participation in the alleged deprivation. *Monell v. Dep't of Soc. Servs. of New York*, 436 U.S. 658, 691–92, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).

To establish § 1983 liability against a municipality, plaintiffs must show: deprivation of constitutional rights by the government that had a custom or policy amounting to at least a deliberate indifference to plaintiffs' constitutional rights, and that the custom or policy was the moving force behind the constitutional violation. *Blair v. City of Pomona*, 223 F.3d 1074, 1079 (9th Cir.2000).

### ANALYSIS

#### a. First Amendment: Applied Challenge

The First Amendment prohibits Congress from making any law that abridges the freedom of speech. U.S. Const. Amend. I. The Fourteenth Amendment makes this protection applicable to all the states. U.S. Const. Amend. XIV; *Stromberg v. California*, 283 U.S. 359, 368, 51 S.Ct. 532, 75 L.Ed. 1117 (1931). In order to demonstrate a violation of the First Amendment under § 1983, plaintiffs must prove that defendants' actions chilled or deterred plaintiffs' freedom of speech

and such deterrence was a substantial or motivating factor in defendants' conduct. *Mendocino Envtl. Ctr. v. Mendocino County*, 192 F.3d 1283, 1300–01 (9th Cir. 1999).

The first step in the analysis is to determine whether plaintiffs' speech was protected as contemplated by the First Amendment. If plaintiffs were engaged in protected speech, the second step is to identify the nature of the forum. The third and final step is to determine whether defendants' justification for excluding plaintiffs from the forum was constitutional. *See Cornelius v. N.A.A.C.P. Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985). Because this is a First Amendment challenge, defendants bear the burden of showing that the ordinance is constitutionally warranted. *Rosen v. Port of Portland*, 641 F.2d 1243, 1246 (9th Cir.1981).

First, both parties agree that plaintiffs had a First Amendment right to solicit signatures in the Square. Second, the Square is a public forum. As a public forum, plaintiffs' speech may not be restricted, even in a content-neutral manner, unless the restriction is narrow and necessary to serve a substantial governmental interest. *N.A.A.C.P. v. City of Richmond*, 743 F.2d 1346, 1355 (9th Cir.1984); *see also Gerritsen v. City of Los Angeles*, 994 F.2d 570, 576 (9th Cir.1993) ("public parks . . . represent the quintessential public forum. . . .").

Third, plaintiffs argue that defendants cannot show that excluding them from the parks furthered an important or substantial governmental interest. Where a content-neutral regulation,[2] as applied,

---

**2.** In deciding whether a government regulation is content neutral, the purpose of the regulation controls. "A regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others." *Ward v. Rock Against Racism*, 491 U.S. 781, 791, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989). Both parties agree that the ordinance at issue is unrelated to content.

punishes conduct that is interwoven with speech activity, the regulation is justified if: (1) the government is constitutionally authorized to regulate the conduct; (2) the regulation serves a substantial governmental interest; (3) the governmental interest is not related to the suppression of speech; and (4) any incidental burden on speech is no more than necessary. *City of Erie v. Pap's A.M.,* 529 U.S. 277, 296, 120 S.Ct. 1382, 146 L.Ed.2d 265 (2000).

It is well settled that the government may legitimately exercise its police powers to advance esthetic objectives. *Members of City Council of City of Los Angeles v. Taxpayers for Vincent,* 466 U.S. 789, 805, 104 S.Ct. 2118, 80 L.Ed.2d 772 (1984). The ordinance under which plaintiffs were cited (Advertising and Decorative Devices) was likely created for the purpose of preserving the attractiveness and intact condition of the Square and other Portland-area parks. Plaintiffs do not dispute that it is within the City's constitutional power to attempt to improve its appearance or that this interest is unrelated to the suppression of ideas. Defendants also state that the exclusion ordinance furthers the important governmental interest in the enjoyment, convenience, and safety of all park users. The ordinance does so by removing people at or near the time they engaged in the illegal behavior, prevents those people from engaging in similar behavior in that park for thirty days, and acts as a deterrent to others. Plaintiffs concede this is also a significant governmental interest. Thus, plaintiffs agree that defendants can meet the first and third prongs of the *Erie* test. Accordingly, the critical inquiries are whether the governmental interest is sufficiently substantial to justify the effect of the ordinance on plaintiffs' freedom of speech, and whether that effect is no greater than necessary to accomplish the City's purpose.

The fourth prong of the *Erie* analysis poses the most significant problem for the defendants: whether the incidental burden on speech imposed by the ordinance is no greater than necessary. In order for a regulation that infringes on constitutionally protected activity in a public park to satisfy the fourth prong of *Erie,* the regulation must be narrowly tailored to meet a compelling governmental interest. *Ward,* 491 U.S. at 791, 109 S.Ct. 2746. As a result of their citation, plaintiffs were completely banned from three parks for thirty days. Other than arguing that this punishment deters future misconduct by plaintiffs, defendants do not address how applying this ordinance to plaintiffs furthers a substantial governmental interest. Absent some showing that plaintiffs were likely to come back into these parks and detract from their attractiveness during the subsequent thirty days, the exclusion did not rationally serve defendants' purpose. In addition, the infringement on plaintiffs' First Amendment activities caused by the park exclusions cannot be said to have been "no greater than necessary." Not only was their protected First Amendment activity of petitioning for signatures abruptly terminated, but all subsequent First Amendment activity in which plaintiffs would have engaged in within the three parks was foreclosed for thirty days.

There are many other methods by which defendants could have met their governmental interest that would have imposed a comparatively minor impact on plaintiffs' free speech rights. Most notably, the officers could have simply informed plaintiffs to take down the sign and in their discretion issued a citation. Alternatively, the park exclusion could have allowed plaintiffs back into the parks for lawful First Amendment activities, excluded plaintiffs from returning to the parks for the purpose of placing sings on statues, or it could

have been for a shorter duration. Each of these alternatives would still have adequately served defendants' interest in preserving the attractiveness of the parks and would have been a less onerous infringement on plaintiffs' First Amendment rights. The park exclusion, under these facts, was a needless and unnecessary infringement on plaintiffs' rights.

Defendants argue that because plaintiffs were free to visit all other City parks or to solicit signatures on the public sidewalks, the incidental impact on plaintiffs' freedom of speech was *de minimis*. This argument is without merit. As this court stated in *Rohman v. City of Portland,* 909 F.Supp. 767, 774 (D.Or.1995), the presence of adequate alternative channels for communication will not save a restriction that is not narrowly tailored. Also, the Square's boundaries encompass the sidewalks surrounding it. Thus, because the ordinance here is not narrowly tailored to serve a significant governmental interest, it does not matter whether plaintiffs would have been able to petition for signatures in other areas.

### b. First Amendment: Facially Overbroad

 Because of the great importance of freedom of expression in our constitutional scheme, the Supreme Court has developed several techniques of statutory analysis to make certain that freedom of expression gets the extra protection it requires. One of these techniques is the use of the doctrine of overbreadth. A statute is overbroad if, in addition to proscribing activities which may be constitutionally forbidden, it also encompasses speech or conduct which is protected by the First Amendment. *See generally, Thornhill v. Alabama,* 310 U.S. 88, 60 S.Ct. 736, 84 L.Ed. 1093 (1940).

 However, courts are hostile to facial condemnation of a statute or ordi-

nance whose primary focus is to prohibit tangible harms unrelated to the content of the speech. *Roulette v. City of Seattle,* 97 F.3d 300, 305 (9th Cir.1996). Plaintiffs must demonstrate "that the ordinance, by its terms, seeks to regulate either spoken words or patently expressive or communicative conduct". *Vlasak v. Superior Court of California ex rel. County of Los Angeles,* 329 F.3d 683, 688 (9th Cir.2003) (internal citations omitted).

 Not every ordinance that burdens expressive conduct violates the First Amendment. *Nunez by Nunez v. City of San Diego,* 114 F.3d 935, 950 (9th Cir. 1997). Where a facial challenge to an ordinance involves conduct, the ordinance's overbreadth "must not only be real, but substantial as well, judged in relation to [its] plainly legitimate sweep." *Broadrick v. Oklahoma,* 413 U.S. 601, 615, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973). Thus, an ordinance will implicate the First Amendment if: (1) it inflicts an incommensurate burden on those engaged in First Amendment activities; or (2) it attempts to regulate conduct that involves expressive or communicative conduct. *Arcara v. Cloud Books, Inc.,* 478 U.S. 697, 703–04, 106 S.Ct. 3172, 92 L.Ed.2d 568 (1986).

The line distinguishing unprotected conduct from sufficiently expressive conduct is hazy. For example, the Ninth Circuit has found that sitting or lying on a sidewalk in certain commercial zones is not integral to or commonly associated with expression. *Roulette,* 97 F.3d at 303–04. A year later, the Ninth Circuit found that a curfew that banned youth from accessing any and all public forums during certain hours integrally affected the ability of youth to express themselves. *Nunez,* 114 F.3d at 950–51.

Plaintiffs concede that PCC 20.12.265 does not specifically address speech. However, plaintiffs dispute defendants'

contention that the conduct it prohibits is not conduct necessarily associated with protected speech activity. The Ninth Circuit stated in *Nunez* that because the San Diego City ordinance restricted minors' ability to engage in many First Amendment activities during curfew hours, it impermissibly interfered with "expression or conduct commonly associated with expression." *Id.* at 950.

■ Plaintiffs assert that the same reasoning applies in this case. Public parks are special places for First Amendment activities because they are the venues people go to speak and express their ideas and are the optimal place to receive information. *Greer v. Spock*, 424 U.S. 828, 857–58, 96 S.Ct. 1211, 47 L.Ed.2d 505 (1976). The ability to be *physically present* in quintessential public forums is necessary to engaging in free speech in those forums. However, PCC 20.12.265 precludes plaintiffs and others from being physically present to participate in clearly protected activities such as picketing, demonstrating, delivering a speech, or leafleting. Thus, the ordinance regulates conduct (physical presence) that is essential to a much broader variety of protected speech conduct.

Moreover, under the ordinance, a person may be excluded from the parks for any violation of any state or City law and there is no prerequisite that the violation occur within a park or bear any relation to the use of a park. *See* PCC 20.12.265 (A person may be excluded from any City park for not more than thirty days for violating "any provision of this Code, any City ordinance, any of the laws of the State of Oregon, an ordinance adopted by [Tri–Met] ... or any rule or regulation duly made ... by the Commissioner In Charge of the Bureau of Parks."). A narrowly-tailored ordinance would not have a one-size-fits-all thirty-day exclusion irrespective of the nature of the violation.

The court finds that PCC 20.12.265 is not narrowly tailored. As such, it is unnecessary to proceed further. *Gerritsen*, 994 F.2d at 577 (the failure to satisfy any prong of the *Ward* test makes it unnecessary to consider the remaining prongs). Nonetheless, for the sake of argument, the court proceeds to the third prong of the *Ward* analysis: whether the exclusion ordinance offers ample alternative channels for legitimate expression.

Under the ordinance, all excluded persons are absolutely banished for thirty days and are prohibited from using the parks from which they are excluded for any type of expressive conduct. By banning plaintiffs and those who violate any law instigating the exclusion ordinance from public parks, defendants reduce the quantity and quality of expression available. As noted above, public parks are unparalleled venues in which people may express ideas, exchange information, and engage in protected associational conduct.

Defendants argue that PCC 20.12.265 leaves open ample alternative avenues for communication because a person excluded from some parks may still visit other parks. However, an alternative mode of communication is constitutionally inadequate under *Ward* if the speaker's "ability to communicate effectively is threatened." *Taxpayers for Vincent*, 466 U.S. at 812, 104 S.Ct. 2118. Further, if the speaker is not permitted to reach her intended audience, any alternative is not ample. *Bay Area Peace Navy v. United States*, 914 F.2d 1224, 1229 (9th Cir.1990).

In *Taxpayers for Vincent*, plaintiffs challenged a City ordinance that prohibited the posting of signs on public property. 466 U.S. at 792, 104 S.Ct. 2118. The court found that because the ordinance did not affect any individual's right to speak and distribute literature in the same place where the posting of signs on public prop-

erty was prohibited, adequate alternative channels of communication were available. *Id.* at 812, 104 S.Ct. 2118. Additionally, in *Heffron v. Int'l Soc. for Krishna Consciousness, Inc.*, 452 U.S. 640, 101 S.Ct. 2559, 69 L.Ed.2d 298 (1981), members of a religious sect challenged a state fair rule that prohibited the sale or distribution on fair grounds of any merchandise not from a fixed location. The Supreme Court held that the rule did not violate the First Amendment and that alternative channels of communication were left open because the rule did not deny access to the forum. *Id.* at 655, 101 S.Ct. 2559. Plaintiffs were not excluded from the fairgrounds and were still able to mingle with the crowd and orally proclaim their views. *Id.*

Unlike the facts present in *Taxpayers for Vincent* and *Heffron*, plaintiffs in this case were denied any and all access to three City parks for thirty days. They were not permitted to reach their intended audience: those who were present within the Square and the other parks. The Square " 'is the City of Portland's premier public gathering spot,' and has been described as 'the City's living room.'" *Id.* To deprive plaintiffs access to this incomparable forum during the ballot initiative season only elucidates the lack of ample alternative channels of communication that were available to plaintiffs.

### c. Substantive Due Process

■ The Due Process Clause of the Fourteenth Amendment provides that no state shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const. Amend. XIV. Where an ordinance impairs a fundamental right, in order to pass constitutional muster, the government's objective must be compelling and the relation between that objective and the means must be necessary. *County of Santa Cruz, Cal. v. Ashcroft*, 279 F.Supp.2d 1192, 1201 (N.D.Cal.2003) (citing *Shapiro v. Thompson*, 394 U.S. 618,

627–35, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969)).

Defendants argue that the protections of substantive due process have mostly been applied to matters relating to marriage, family, procreation, and the right to bodily integrity. Because plaintiffs claim that PCC 20.12.265 infringes on their rights to go to the City parks to gather signatures for initiative petitions, defendants argue plaintiffs' claims should fall under the First Amendment, and not for deprivation of their rights to substantive due process under the Fourteenth Amendment. Thus, defendants argue that plaintiffs' facial substantive due process challenge turns on whether the ordinance is rationally related to a legitimate governmental interest. However, the Supreme Court explicitly stated in *De Jonge v. State of Oregon*, 299 U.S. 353, 364, 57 S.Ct. 255, 81 L.Ed. 278 (1937), "Freedom of speech [is a] fundamental right [that is] safeguarded by the due process clause of the Fourteenth Amendment of the Federal Constitution." *See also NAACP v. Button*, 371 U.S. 415, 431, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963).

■ The presence of obvious, less burdensome alternatives is relevant in determining whether an ordinance is "necessary." *See City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 417–18, 113 S.Ct. 1505, 123 L.Ed.2d 99 (1993). In this case, there are numerous ways to protect the safety of the parks that are less oppressive to the freedom of movement and travel than this park exclusion ordinance. Each violation that initiates the park exclusion ordinance is itself a punishable offense under either state or local law. For example, unlawful use of police badges (PCC 14A.30.040), use of skateboards (PCC 20.12.205), or sounding whistles (PCC 20.12.115) would all violate a Portland City ordinance and are all independently punishable by a fine and/or citation.

These punishments adequately satisfy the public safety needs of the community, whether they occur in a park or elsewhere. *See Nemo v. City of Portland*, 910 F.Supp. 491, 496 (D.Or.1995) (court found that although avoiding excess noise in the Square, keeping the Square attractive, and ensuring park safety were all important governmental interests, these interests could be furthered "through existing City ordinances regulating such noise, litter, and graffiti.").

Defendants have presented no evidence that any offense occurring within a park poses a greater risk to the public than the same offense occurring on a public street or in another public place. Yet, although PCC 20.12.265 excludes violators from public parks, there appears to be no corresponding ordinance excluding violators from public streets or other public places. Accordingly, the park exclusion ordinance cannot be said to be necessary to protect the safety of the parks.

The ordinance is also not narrowly tailored. The ordinance imposes a substantial burden on an individual's fundamental rights even where the offense does not occur in a park and where no showing can be made that the prohibited conduct endangered park safety. Moreover, to be narrowly tailored, the ordinance must target and expel nothing more than the precise source of the "evil" it seeks to prevent. *Taxpayers for Vincent*, 466 U.S. at 808–810, 104 S.Ct. 2118. Here, the perceived evil is the particular ongoing offensive conduct in the park, hence the exclusionary period of thirty days. However, to eliminate the offensive conduct, the government could exclude the violator from the public area in which she is offending if a citation alone did not accomplish the same result. That would satisfy the standard set forth in *Taxpayers for Vincent* and would be a temporary exclusion aimed at eliminating nothing more than the exact source of evil that the government wishes to remedy.

### d. Procedural Due Process

In determining whether procedures adequate to satisfy due process were accorded plaintiffs, courts use a balancing test in which the cost of requiring a particular set of procedures will be weighed against the benefits from the use of those procedures. *See City of Los Angeles v. David*, 538 U.S. 715, 123 S.Ct. 1895, 1896, 155 L.Ed.2d 946 (2003). On one side of the equation are: (1) the strength of the private interest that would be affected by the official action and (2) the "risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards." *Id.* (quoting *Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976)). On the other side of the equation is "the government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Id.* (quoting *Mathews*, 424 U.S. 319 at 335, 96 S.Ct. 893, 47 L.Ed.2d 18). By balancing these concerns, the court can determine whether the government has met the "fundamental requirement of due process"—"the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Id.* (quoting *Mathews*, 424 U.S. at 333, 96 S.Ct. 893).

Applying the test articulated in *Mathews* and affirmed by *David*, plaintiffs argue that excluded individuals have a strong interest in avoiding unjust or unwarranted exclusions from the City's parks. The public parks are a treasured and unmatched resource to those who live in the City of Portland, especially the Square. Aside from serving as vital forums for the exercise of free speech, the

parks host a variety of activities including festivals, concerts, and art exhibitions.

In addition, the risk of erroneous deprivation under the present procedure is considerable given the list of entities authorized to issue exclusions, the lack of appropriate notice to those excluded, and the absence of any pre-deprivation process. The exclusion ordinance fails to establish any evidentiary standard for any park official or employee, employee of any nonprofit corporation with which the City has a park management agreement, or police officer to determine whether an exclusion is warranted before issuing the exclusion. The ordinance does not provide that the entity issuing the exclusion actually witness the alleged violation or have any other reliable information that a violation in fact occurred. Moreover, there is no requirement that the reason for the exclusion be provided to the excluded individual. This deprives those excluded of the right to be informed of the nature of the charges and the substance of the relevant supporting evidence. *See In re Kelly,* 841 F.2d 908, 915 (9th Cir.1988).

The risk of erroneous deprivation is compounded by PCC 20.12.265's deficient appeal procedures and lack of a pre-deprivation hearing. An exclusion takes effect immediately upon issuance and is not stayed pending appeal. Thus, a person excluded from a park is subject to arrest for reentry as soon as she receives the exclusion notice. An appeal may be filed within five days, but the individual continues to be excluded from the parks. Thus, even if the exclusion is ultimately found to be invalid, the individual has been kept from the public park(s) for at least a significant portion of the thirty days.

Plaintiffs argue that a pre-deprivation hearing would at least provide a necessary check against the risk of erroneous decisions. *See Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 313, 70 S.Ct. 652, 94 L.Ed. 865 (1950) (the core requirement of the due process clause is that an individual be provided an opportunity for a hearing *prior* to being deprived of any significant liberty interest); *see also Memphis Light, Gas & Water Div. v. Craft,* 436 U.S. 1, 19, 98 S.Ct. 1554, 56 L.Ed.2d 30 (1978) (a pre-deprivation hearing may not be required "where the potential length or severity of the deprivation does not indicate a likelihood of serious loss and where the procedures ... are sufficiently reliable to minimize the risk of erroneous determination ....").

Judge Panner reviewed an earlier procedural due process challenge to the former PCC 20.12.265 (*McLain v. Portland,* CV 87–986) and found that the appeal process provided adequate protection. However, under the earlier ordinance, an appeal was made to the Commissioner of Parks, had to be filed within ten days and a decision had to be rendered within ten days of filing. The *current* ordinance requires filing of the appeal within five days, and there is no requirement that the appeal be decided within ten days. *See* PCC 20.12.265. Thus, under the revised ordinance, an excluded individual loses his right to appeal the exclusion in half the time,[3] and there is no longer the safeguard that her appeal will be adjudicated within ten days.

Defendants place a strong emphasis on the fact that in 2002, there were 2,049 park exclusions issued and twenty-six appeals filed. Of those appeals, two were denied, either because they were untimely or there was no written exclusion, and eight were withdrawn by the appellants. In 2001,

---

**3.** This is important because plaintiffs, for example, did not understand their appeal rights until the sixth day of their exclusion when they went to the City Hearings Office and were told they were too late.

there were 2,537 exclusions issued and thirty-three appeals. Of those appeals, one was denied, twelve were withdrawn, and the exclusions were sustained in thirteen cases after hearing, modified in three, and reversed in four. Thus, defendants claim that plaintiffs cannot show that there is a high risk of an erroneous deprivation.

The court finds these statistics unconvincing. On these facts, it is indeterminable whether the low ratio of appeals to exclusions reflects the accuracy of the officers' decision to issue an exclusion notice, a lack of understanding on how to assert legal rights among those excluded, or the actual absence of any lawful purpose for being in the public parks. If the number of appeals would go up with a change in procedures, that would suggest that the existing standard deters review. It could also suggest that the present standard contains a high risk of error.

Turning to the second part of the *Mathews* balancing test, plaintiffs argue that defendants' interest in denying additional procedural protection is minimal. The government has an interest in terminating offensive conduct that creates a safety risk in the parks. This can be accomplished either by issuing a citation and/or fine or removing the offender from the park if the conduct continues. However, immediately enforcing the thirty-day exclusionary period does not further alleviate any safety risks created by the offensive conduct that purportedly justifies the exclusion. The government is interested in creating a deterrent effect. Yet, absent a showing that the offending individual is likely to re-offend during the exclusionary period, the government's interest wanes. The government's interest in park safety could just as easily be served through a pre-deprivation hearing or other mechanism that would provide the individual an opportunity to prove that she did not violate any ordi-

nance or law and yet still satisfy the government's interests.

Moreover, a pre-deprivation hearing or other procedural safeguard would not unduly burden the government. Although the availability of a pre-deprivation hearing may create some additional administrative burden, it is no greater than the pre-deprivation process already in place to handle a variety of non-criminal violations, such as traffic fines. Also, there would be no additional burden on the City if the park exclusions were simply stayed in the event that an individual filed an appeal. *See* PCC 14.100 (Drug Free Zone ordinance) and PCC 14.150 (Prostitution Free Zone ordinance) (both of these ordinances provide for stays pending appeal).

**e. 42 U.S.C. § 1983**

Defendants claim that plaintiffs are unable to show either direct participation by Pioneer Courthouse Square of Portland, Inc. (PCSI) in the acts of Officer Button, nor any City of Portland custom amounting to a deliberate indifference that was the moving force behind any violation of plaintiffs' constitutional rights. Defendants assert that plaintiffs were excluded by a private security officer acting under a subcontract to provide security services at the Square, and thus § 1983 is inapplicable.

 Defendants' argument is without merit. A municipality may be held liable under § 1983 "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury...." *Monell*, 436 U.S. at 694, 98 S.Ct. 2018. Official policies are those that are intended to establish fixed plans of action to be followed under similar circumstances consistently, and are often embodied in a writ-

ten statement, such as a city ordinance. *See id.*

■ The court finds that it is municipal policy to have PCC 20.12.265 enforced as written. Defendant PCSI manages the Square on behalf of the City. They contract with PPI to provide security within the Square. The exclusion ordinance was enforced in the Square and against plaintiffs by the PCSI. Thus, PCSI is directly responsible for the constitutional harms asserted by plaintiffs.

Alternatively, defendants argue that the "good faith" defense is available to them. In *Wyatt v. Cole,* 504 U.S. 158, 166, 169, 112 S.Ct. 1827, 118 L.Ed.2d 504 (1992), the Supreme Court, in rejecting qualified immunity for private defendants, specifically left open the question of whether private defendants who had no entitlement to qualified immunity, could assert good faith and/or probable cause as an affirmative defense. Plaintiffs assert that the facts of this case weigh heavily against such a defense being afforded to PCSI. PCSI is a private, non-profit organization that stands in the City's shoes when it manages and provides security protection in the Square. Accordingly, when a private actor like PCSI plays a traditionally public role, it should not be permitted to defend itself against constitutional challenges directly relating to managing and providing security in the park based on a "good faith" belief that the laws were constitutional.

This defense has explicitly remained an open question since *Wyatt* and the court finds no reason to make precedent at this point. It is a novel defense, but its application could make it potentially available in any conceivable case and because there are no clear parameters set as to what constitutes a "good faith belief that laws are constitutional," there would likely be very few cases in which plaintiffs would be awarded relief for violations of constitutional rights. Additionally, if this defense

was recognized, nearly every constitutional case would proceed to trial because application of the defense necessarily involves questions of fact making summary judgment inappropriate. This involves unnecessary congestion of the courts with cases that could, and should be, summarily decided on the appropriate questions of law.

## CONCLUSION

For these reasons, plaintiffs' Motion for Summary Judgment (Doc. # 30) is GRANTED and defendants' Motion for Summary Judgment (Doc. # 33) is DENIED. Defendants are liable to plaintiffs for compensatory damages for violations of their constitutional rights.

IT IS SO ORDERED.